E-filing

SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP
Alan R. Plutzik, Of Counsel (Bar No. 077785)
Nichole Browning (Bar No. 251937)
2125 Oak Grove Road, Suite 120
Walnut Creek, California 94598
Telephone: (925) 945-0770
Fax: (925) 945-8792

-and-

ERIC L. ZAGAR (Bar No. 250519)
TARA P. KAO
ezagar@sbtklaw.com
tkao@sbtklaw.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

Attorneys for Plaintiff

ORIGINAL FILED
FEB 2 0 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| PATRICK McWEENY, derivatively on behalf of ATMEL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>GEORGE PERLEGOS, GUST PERLEGOS, T. PETER THOMAS, CHAIHO KIM, PIERRE FOUGERE, NORMAN T. HALL, TSUNG-CHING WU, KRIS CHELLAM, JACK PECKHAM, DONALD COLVIN, MIKES N. SISOIS, B. JEFFREY KATZ, FRANCIS BARTON, GRAHAM TURNER, BERNARD PRUNIAUX, STEVEN SCHUMANN, and MIKE ROSS,<br><br>Defendants,<br>and<br><br>ATMEL CORPORATION,<br><br>Nominal Defendant. | Case No.<br><br>**C08-01031**<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>ADR<br>PVT<br><br><br>**JURY TRIAL DEMAND** |

1    Plaintiff Patrick McWeeny ("McWeeny"), by the undersigned attorneys, derivatively on

2    behalf of Atmel Corporation ("Atmel" or the "Company") allege upon personal knowledge as to

3    themselves and their own acts, and upon information and belief as to all other matters, based upon,

4    *inter alia*, the investigation conducted by and through their attorneys, which included, among other

5    things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press

6    releases, and other publicly available documents regarding Atmel as follows:

7    ## NATURE OF THE ACTION

8    1.    This is a shareholder's derivative action brought for the benefit of nominal

9    defendant Atmel against certain members of its Board of Directors (the "Board") and certain of its

10    executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment,

11    statutory violations, and other violations of law.

12    2.    This action seeks redress for the harm done to Atmel, and indirectly to its

13    stockholders, resulting from the self-dealing of certain of the Company's top executives and

14    directors who breached their fiduciary duties of loyalty and good faith to the Company by

15    intentionally manipulating Atmel stock option grants between February 1994 and April 2003. As a

16    result of their misconduct, certain defendants have secured a huge windfall for themselves at the

17    expense of Atmel, caused the misstatement of Atmel's financial results from the Company's fiscal

18    year 1996 through the present, which in turn caused the Company to restate its financial statements

19    to account for *$116 million* in additional compensation expenses.

20    3.    These key executives and directors backdated stock option grants in order to

21    exercise the stock option grants at a lower strike price, thus pocketing more money than they were

22    otherwise entitled to receive. A stock option granted to an employee or director of the Company

23    allows the employee or director to purchase Company stock at a specified price – referred to as the

24    "exercise price" – for a specified period of time. Stock options are typically granted as part of an

25    employee's or director's compensation package to create incentives for him or her to boost

26    profitability and the Company's stock value. When an employee or director exercises an option, he

27    or she purchases the stock from the Company at the exercise price, regardless of the stock price at

28

1    the time the option is exercised. Option pricing is based on the price of the Company's common

2    stock on the day of the grant.

3    4.    If an option is backdated to a day on which the market price was lower than the

4    price on the day the option is granted, as Atmel has admitted was the case here, then the employee

5    or director pays less and the Company receives less money for the stock when the option is

6    exercised.

7    5.    Indeed, in a striking pattern, 100% of the discretionary grants on 13 separate grant

8    dates made from February 1994 through April 2003 coincided with Atmel's historically low

9    closing prices – eight of the grants were purportedly made at or near the *lowest price of the fiscal*

10    *year* and nine were made at or near *the lowest price of the fiscal quarter*. Defendants granted

11    stock options to Atmel executives officers on dates at which Atmel stock had reached one of its

12    lowest stock prices in weeks, if not months. More strikingly, these grants almost invariably

13    preceded sharp gains, and/or followed significant drops in the Company's stock price.

14    6.    As demonstrated below, these perfectly-timed option grants could not have been the

15    result of mere coincidence. They were, in reality, the result of improper and opportunistic option

16    granting practices. Because the Company failed to comply with the Generally Accepted

17    Accounting Principles ("GAAP") governing the expensing of stock option grants, the backdating

18    scheme had a material effect on Atmel's financial statements from 1996 through the present. As

19    explained *infra*, to the extent the Company failed to record, as a compensation expense, the

20    difference between the price of Atmel stock on the date of the actual grant and the "backdated"

21    exercise price of the options, this deliberate omission resulted in the material understatement of the

22    Company's reported compensation expense measures and a material overstatement of its reported

23    income measures throughout the relevant period.

24    7.    The backdating practices directed by defendants rendered materially false and

25    misleading each of the Company's annual proxy statements to shareholders, which purported to set

26    forth the true amount and type of compensation of its most highly-compensated executives, as

27    required by rules promulgated by the SEC. Additionally, the practice of backdating has rendered

28    the defendants' statements regarding the Company's executive and director stock-based

1    compensation, contained in Atmel's annual reports and annual proxy statements, materially false

2    and misleading.

3        8.    The secret practice of backdating stock options was exposed on March 18, 2006,

4    when *The Wall Street Journal* published an article entitled "The Perfect Payday," which described

5    stock option backdating practices by a number of companies where their executives had achieved

6    extremely fortuitous stock option paydays -- the likelihood of which defied random chance. *The*

7    *Wall Street Journal*, together with Erik Lie, a professor at Tippie College of Business at the

8    University of Iowa, David Yermack, a professor at New York University Stern School of Business,

9    and John Emerson, a professor at Yale University, studied patterns of particularly favorable stock

10    grants at certain companies and calculated the probability of such patterns occurring randomly and

11    concluded that the odds were improbable.

12        9.    This practice of backdating stock options, though widespread, remained virtually

13    undetected until such academic research revealed patterns of stock option grants that could not be

14    explained by chance. These studies noted the frequency with which stock option grants occurred

15    just after a drop in stock price and immediately before the price rose, often at the lowest price of

16    the year. Such timing could not be statistically explained by random selection of grant dates. One

17    study hypothesized that the dates of the grants had been selected retroactively. Such retroactive

18    dating, or "backdating," would permit the grantor to select the most advantageous price for the

19    stock option and to effectively grant "in-the-money" stock options (where the exercise price of the

20    option is lower than the stock price on the date of grant) that appeared to be granted when the stock

21    price was at a historical low. Since companies are required to report in-the-money grants as

22    compensation to the recipient and as a charge to the corporation, the practice of backdating would

23    provide a means to confer additional stock value, or compensation, to officers and employees that

24    was not detectable, thereby concealing the additional compensation and foregoing the reporting or

25    recording of the charge.

26        10.    On May 26, 2006, *Forbes*, in an article titled "The Next Big Scandal," quoted

27    Former SEC Chairman Harvey L. Pitt, saying "What's so terrible about backdating options grants?

28    For one thing, it likely renders a company's proxy materials false and misleading. Proxies

typically indicate that options are granted at fair market value. But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

11.    On June 18, 2006, in an article titled, "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted as saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here' . . . . It's a question of knowingly betting on a race that's already been run."

12.    On September 6, 2006, the United States Senate Committee on Finance held a hearing, "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits."

13.    At the Senate Finance Committee Hearing, the Senate Finance Committee Chairman, Senator Chuck Grassley, in his opening statement, stated:

> [Options backdating] is behavior that, to put it bluntly, is disgusting and repulsive. It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves. And as we have found far too often in corporation scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . .

14.    In his statement before the Senate Finance Committee, Deputy Attorney General Paul J. McNulty stated that the practice of stock option backdating, "can only be seen as a brazen abuse of corporate power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders," and said "[f]or some of those companies that have now disclosed backdated grants, corporate reputations have been tarnished and shareholder value has diminished substantially. . . ."

15.    Also at the Senate Finance Committee Hearing, the Chairman of the SEC, Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws."

1    16.    Atmel has *admitted* that its past option grants had been improperly dated and that,

2  as a result, it would have to restate its past financial statements as they could no longer be relied

3  upon.    Specifically, on October 30, 2006, Atmel *admitted that "in connection with the*

4  *requirements of Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to*

5  *Employees ('APB25'), the actual measurement dates for certain stock options differed from the*

6  *recorded measurement dates for such stock options."*    Specifically, in Atmel's April 30, 2007

7  press release, the Company stated that *"93 of the 112 stock option grants* during the period

8  January 1, 1997 through August 3, 2006 included some options that were not issued on the date set

9  forth in the company's stock option records." (emphasis added).

10    17.    Moreover, on May 17, 2007, the Company announced that "George Perlegos [] was

11  responsible for widespread *and intentional stock options backdating*." In the Company's April

12  30, 2007 press release, the Company admitted that "Mr. Perlegos was aware of, and often directed,

13  the backdating of stock option grants.    The evidence included handwritten notations from Mr.

14  Perlegos expressly directing stock administration employees to use prior Board meeting dates for

15  many employees' stock option grants." (emphasis added).

16    18.    By engaging in this scheme, the defendants were able to conceal that Atmel was not

17  accounting for its compensation expenses properly and was materially overstating the Company's

18  net income and earnings for 1994 through the present. Atmel has admitted that the difference in

19  these measurement dates will result in material non-cash, stock-based compensation expenses,

20  which will have the effect of decreasing net income or increasing net loss and increasing

21  accumulated deficit as reported in the Company's historical financial statements.

22    19.    On June 8, 2007, the Company filed its fiscal 2006 financial statements, stating that

23  "[u]pon completion of that investigation, the Company recorded additional aggregate non-cash

24  stock-based compensation expenses for the period from 1993 through 2005, excluding payroll and

25  related income tax adjustments, of approximately *$116 million*." (emphasis added).

26    20.    In addition to being unjustly enriched by the mere receipt of backdated options,

27  from April 1997 to the present, Defendants Chellam, Hall, Gust Perlegos, George Perlegos and

28

Thomas collectively realized over $16 million in gross proceeds, partially through the exercise of these illegally backdated options grants and subsequent sales of Atmel stock.

21.    In addition to the serious and adverse tax consequences resulting from the Company's failure to record the appropriate non-cash stock-based compensation expenses, Atmel faces millions in costs associated with the Audit Committee's review and the related restatements. Atmel will likely admit to material weakness in its financial controls resulting in a qualified opinion from its outside auditor. Atmel's executives were also overpaid improper cash bonuses based on inflated earnings, which created an inflated market capitalization for Atmel common stock.

22.    As alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Atmel, defendants intentionally colluded with one another to:

a.    improperly backdate multiple grants of Atmel stock options to several Atmel executives and directors, in violation of the Company's shareholder-approved stock option plans;

b.    improperly record and account for the backdated stock options, in violation of GAAP;

c.    improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)");

d.    produce and disseminate false financial statements and other false SEC filings to Atmel shareholders and the market that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

e.    improperly cause Atmel to violate applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements and restricting the misuse of material non-public information.

23.    This action states derivative claims for the defendants' violations of Sections 10(b), 14(a) and 20(a) of the Exchange Act and SEC Rule 10b-5. This action also seeks disgorgement of bonuses or other incentive-based or equity-based compensation received by the defendants who received backdated options, and for any profits realized from their sale of Atmel securities, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002.

24.    As a result of the egregious misconduct by certain defendants, Atmel has sustained millions of dollars in damages, including damage to its reputation and loss of goodwill in general,

1   exposure to an adverse opinion by its outside auditors and considerable financial cost in having to

2   review and restate previously issued financial statements and has been exposed to civil liability and

3   potential regulatory fines by the SEC and Internal Revenue Service ("IRS") for failure to pay or

4   withhold taxes. Meanwhile, the recipients of the backdated stock options have garnered millions of

5   dollars in unlawful profits.

6                          **JURISDICTION AND VENUE**

7           25.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that this

8   Complaint states a federal question. This Court also has jurisdiction over this action pursuant to 28

9   U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in

10  controversy exceeds $75,000.00, exclusive of interests and costs. This Court has supplemental

11  jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is

12  not a collusive one to confer jurisdiction on a court of the United States which it would not

13  otherwise have.

14          26.    Venue is proper in this district because a substantial portion of the transactions and

15  wrongs complained of herein, including the defendants' primary participation in the wrongful acts

16  detailed herein, occurred in this district. One or more of the defendants either resides in or

17  maintains executive offices in this district, and defendants have received substantial compensation

18  in this district by engaging in numerous activities and conducting business here, which had an

19  effect in this district.

20                               **PARTIES**

21          27.    Plaintiff McWeeny is, and was at all relevant times, a shareholder of nominal

22  defendant Atmel. Plaintiff McWeeny purchased Atmel common stock in March 1997, has

23  continuously held stock in Atmel throughout the wrongs complained of and continues to hold his

24  shares of Atmel common stock. Plaintiff McWeeny is a citizen of the State of Illinois.

25          28.    Nominal defendant Atmel is a Delaware corporation with its principal executive

26  offices located at 2325 Orchard Parkway, San Jose, California 95131. Until October 1999, Atmel

27  was incorporated in California. According to its public filings, Atmel designs, develops,

28  manufactures and sells a wide range of integrated circuit products, including microcontrollers,

advanced logic, mixed-signal, nonvolatile memory and radio frequency components. Atmel has had more than 500 shareholders of record at all times relevant hereto.

**Defendant George Perlegos**

29. Defendant George Perlegos served as the Company's President, Chief Executive Officer and as a director from Atmel's inception in 1984 to August 2006. George Perlegos is the brother of defendant Gust Perlegos.

30. George Perlegos received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
| --- | --- |
| 2005 | $829,653 (includes a $100,000 bonus) |
| 2004 | $756,495 (includes a $100,000 bonus) |
| 2003 | $355,343 |
| 2002 | $350,615 |
| 2001 | $357,480 |
| 2000 | $525,537 (includes a $175,183 bonus) |
| 1999 | $400,952 (includes a $80,563 bonus) |
| 1998 | $334,857 (includes a $22,952 bonus) |
| 1997 | $431,511 (includes a $130,881 bonus) |
| 1996 | $296,009 (includes a $195,900 bonus) |
| 1995 | $403,538 (includes a $161,924 bonus) |
| 1994 | $382,764 (includes a $161,924 bonus) |

31. Upon information and belief, on July 23, 2002, George Perlegos sold approximately 125,000 shares of Atmel common stock for proceeds of approximately $457,500.

32. Upon information and belief, George Perlegos is a citizen of the State of California.

**Defendant Gust Perlegos**

33. Defendant Gust Perlegos served as the Company's Executive Vice President, Office of the President from 2001 to August 2006, as a director of Atmel from January 1985 to August 2006, as Executive Vice President and General Manager from January 1996 to 2001 and as Vice President, General Manager from January 1985 to January 1996. Gust Perlegos is the brother of defendant George Perlegos.

34. Gust Perlegos received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
| --- | --- |
| 2005 | $534,596 (includes a $75,000 bonus) |
| 2004 | $507,815 (includes a $75,000 bonus) |
| 2003 | $307,701 |
| 2002 | $305,337 |
| 2001 | $311,324 |
| 2000 | $457,886 (includes a $152,778 bonus) |
| 1999 | $353,190 (includes a $70,258 bonus) |
| 1998 | $292,182 (includes a $20,027 bonus) |
| 1997 | $376,539 (includes a $114,209 bonus) |
| 1996 | $413,065 (includes a $172,240 bonus) |
| 1995 | $350,462 (includes a $141,212 bonus) |
| 1994 | $332,747 (includes a $141,212 bonus) |

35.    Upon information and belief, Gust Perlegos received the following backdated options: (i) an option grant dated February 22, 1995 to purchase 320,000 shares of Atmel common stock at the exercise price of $3.8516; (ii) an option grant dated April 11, 1997 to purchase 40,000 shares of Atmel common stock at the exercise price of $6.0938; (iii) an option grant dated February 14, 2002 to purchase 100,000 shares of Atmel common stock at the exercise price of $7.69; and (iv) an option grant dated November 14, 2002 to purchase 50,000 shares of Atmel common stock at the exercise price of $2.11.

36.    Upon information and belief, since August 6, 1999, Gust Perlegos has sold approximately 340,000 shares of Atmel common stock for proceeds of over approximately $2.295 million.

37.    Upon information and belief, Gust Perlegos is a citizen of the State of California.

**Defendant Thomas**

38.    Defendant T. Peter Thomas ("Thomas") has served as a director of the Company since December 1987 and as a member of the Compensation Committee of the Board (the "Compensation Committee") and the Audit Committee of the Board ("Audit Committee") since at least 1996.

39.    Upon information and belief since August 24, 1999, Thomas sold approximately 1,000,000 shares of Atmel common stock for proceeds of over $10.3 million.

40.    Upon information and belief, Thomas is a citizen of the State of California.

**Defendant Kim**

41.    Defendant Chaiho Kim ("Kim") has served as a director of the Company and as a member of the Audit Committee since September 2002. Kim also served as a member of the Compensation Committee from September 2002 through 2003.

42.    Upon information and belief, Kim is a citizen of the State of California.

**Defendant Fougere**

43.    Defendant Pierre Fougere ("Fougere") has served as a director of the Company, as a member of the Compensation Committee and as a member of the Audit Committee since February 2001.

44.    Upon information and belief, Fougere is a citizen of the State of California.

**Defendant Hall**

45.    Defendant Norman T. Hall ("Hall") has served as a director of the Company from August 1992 until in or about 2005. Hall served as a member of the Compensation Committee from 1997 to 2004 and as a member of the Audit Committee from 1997 to 2003.

46.    Upon information and belief, Defendant Hall sold approximately 128,000 shares of Atmel common stock on August 31, 2000 for approximately $2.56 million in proceeds.

47.    Upon information and belief, Hall is a citizen of the State of California.

**Defendant Wu**

48.    Defendant Tsung-Ching Wu ("Wu") has served as the Company's Executive Vice President, Office of the President since 2001 and as a director since 1985. Wu also served as the Company's Executive Vice President and General Manager from January 1996 to 2001 and as Vice President, Technology from January 1986 to January 1996.

49.    Wu received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
| --- | --- |
| 2005 | $502,711 (includes a $75,000 bonus) |
| 2004 | $477,870 (includes a $75,000 bonus) |
| 2003 | $281,164 |
| 2002 | $284,366 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

10

| 2001 | $289,932 |
| 2000 | $424,275 (includes a $141,427 bonus) |
| 1999 | $321,276 (includes a $64,136 bonus) |
| 1998 | $261,740 (includes a $17,940 bonus) |
| 1997 | $337,310 (includes a $102,310 bonus) |
| 1996 | $371,166 (includes a $155,340 bonus) |
| 1995 | $316,486 (includes a $128,700 bonus) |
| 1994 | $300,215 (includes a $128,700 bonus) |

50.    Upon information and belief, Wu received the following backdated options: (i) an option grant dated February 22, 1995 to purchase 320,000 shares of Atmel common stock at the exercise price of $3.8516; (ii) an option grant dated April 11, 1997 to purchase 40,000 shares of Atmel common stock at the exercise price of $6.0938; and (iii) an option grant dated February 14, 2002 to purchase 100,000 shares of Atmel common stock at the exercise price of $7.69; and (iv) an option grant dated November 14, 2002 to purchase 100,000 shares of Atmel common stock at the exercise price of $2.11.

51.    Upon information and belief, Wu is a citizen of the State of California.

**Defendant Chellam**

52.    Defendant Kris Chellam ("Chellam") served as the Company's Vice President, Finance and Administration and as Chief Financial Officer ("CFO") from September 1991 to July 1998.

53.    Chellam received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
| --- | --- |
| 1997 | $313,826 (includes a $97,186 bonus) |
| 1996 | $345,205 (includes a $145,200 bonus) |
| 1995 | $293,252 (includes a $121,544 bonus) |
| 1994 | $278,965 (includes a $121,544 bonus) |

54.    Upon information and belief, Chellam received the following option grants: (i) an option grant backdated to February 4, 1994 to purchase 128,000 shares of Atmel common stock at the exercise price of $2.29; (ii) an option grant dated February 22, 1995 to purchase 80,000 shares of Atmel common stock at the exercise price of $3.8516; and (iii) another option grant backdated

1    to April 11, 1997, to purchase 40,000 shares of Atmel common stock at the exercise price of

2    $6.0938.

3        55.    Upon information and belief, since April 24, 1997, Chellam has sold approximately

4    419,160 shares of Atmel common stock for proceeds of over approximately $1.27 million.

5        56.    Upon information and belief, Chellam is a citizen of the State of California.

6    **Defendant Peckham**

7        57.    Defendant Jack Peckham ("Peckham") served as the Company's General Manager,

8    ASIC Operations from January 1992 to 1998, as Vice President, Sales from January 1986 to

9    January 1992 and as Director of Sales from June 1985 to January 1986.

10       58.    Peckham received approximately the following as compensation, not including

11   stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 1997 | $301,755 (includes a $97,527 bonus) |
| 1996 | $329,638 (includes a $135,028 bonus) |
| 1995 | $309,780 (includes a $108,664 bonus) |
| 1994 | $271,154 (includes a $108,664 bonus) |

    59.    Upon information and belief, Peckham received the following option grants: (i) an

option grant backdated to February 4, 1994 to purchase 160,000 shares of Atmel common stock at

the exercise price of $2.29; (ii) an option grant dated February 22, 1995 to purchase 80,000 shares

of Atmel common stock at the exercise price of $3.8516; and (iii) an option grant backdated to

April 11, 1997 to purchase 40,000 shares of Atmel common stock at the exercise price of $6.0938.

    60.    Upon information and belief, Peckham is a citizen of the State of California.

**Defendant Colvin**

    61.    Defendant Donald Colvin ("Colvin") served as the Company's Vice President,

Finance and CFO from March of 1998 to January 2003 and as CFO of the Company's Atmel

Rousset S.A. subsidiary from 1995 to 1998.

    62.    Colvin received approximately the following as compensation, not including stock

option grants:

| Fiscal Year | Compensation |
|-------------|--------------|
| 2002 | $232,200 |
| 2001 | $241,468 |
| 2000 | $393,301 (includes a $157,741 bonus) |
| 1999 | $268,356 (includes a $53,388 bonus) |
| 1998 | $159,814 |
| 1997 | $155,749 (includes a $17,505 bonus) |

63.     Upon information and belief, Colvin received the following backdated options: (i) an option grant dated February 12, 1999 to purchase 20,000 shares of Atmel common stock at the exercise price of $3.6719; (ii) an option grant dated July 16, 1999 to purchase 40,000 shares of Atmel common stock at the exercise price of $7.8281; (iii) an option grant dated November 17, 2000 to purchase 40,000 shares of Atmel common stock at the exercise price of $12.125; (iv) an option grant dated September 17, 2001 to purchase 100,000 shares of Atmel common stock at the exercise price of $7.12; and (v) an option grant dated November 14, 2002 to purchase 50,000 shares of Atmel common stock at the exercise price of $2.11.

64.     Upon information and belief, Colvin is a citizen of the State of California.

**Defendant Sisois**

65.     Defendant Mikes N. Sisois ("Sisois") served as the Company's Vice President, Planning and Information Systems from 1986 to August 2006.  Sisois also served as the Company's Director of Information Systems from February 1985 to 1986.

66.     Sisois received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|-------------|--------------|
| 2002 | $213,068 |
| 2001 | $217,236 |
| 2000 | $320,008 (includes a $106,594 bonus) |
| 1999 | $248,594 (includes a $49,369 bonus) |
| 1998 | $207,116 (includes a $14,196 bonus) |
| 1997 | $266,858 (includes a $80,938 bonus) |
| 1996 | $291,689 (includes a $119,920 bonus) |

67.     Upon information and belief, Sisois received the following backdated options: (i) an option grant dated June 11, 1999 to purchase 40,000 shares of Atmel common stock at the exercise price of $5.9063; (ii) an option grant dated July 11, 2002 to purchase 30,000 shares of Atmel

common stock at the exercise price of $5.13; and (iii) an option grant dated November 14, 2002 to purchase 40,000 shares of Atmel common stock at the exercise price of $2.11.

68.    Upon information and belief, Sisois is a citizen of the State of California.

**Defendant Katz**

69.    Defendant B. Jeffrey Katz ("Katz") served as the Company's Vice President, Marketing from November 1998 to 2005.

70.    Katz received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
| --- | --- |
| 1999 | $248,594 (includes a $49,369 bonus) |
| 1998 | $207,116 (includes a $14,196 bonus) |
| 1997 | $266,858 (includes a $80,938 bonus) |
| 1996 | $291,689 (includes a $119,920 bonus) |

71.    Upon information and belief, Katz received an option grant backdated to July 16, 1999, to purchase 10,000 shares of Atmel common stock at the exercise price of $7.8281.

72.    Upon information and belief, Katz is a citizen of the State of California.

**Defendant Barton**

73.    Defendant Francis Barton ("Barton") served as the Company's Executive Vice President and CFO from May 2003 to July 2005.

74.    Barton received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
| --- | --- |
| 2003 | $545,140 (includes a $319,825 bonus) |

75.    Upon information and belief, Barton received an option grant backdated to April 30, 2003, to purchase 500,000 shares of Atmel common stock at the exercise price of $1.81.

76.    Upon information and belief, Barton is a citizen of the State of California.

**Defendant Turner**

77.    Defendant Graham Turner ("Turner") served as the Company's Vice President and General Manager, Microcontroller Segment since October 2001 until July 2007 and remained an

employee of Atmel until October 2007. Turner also served in various positions since he joined the Company in 1989, including Vice President of European Operations from 1993 to October 2001.

78.    Turner received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2005 | $437,693 (includes a $136,841 bonus) |
| 2004 | $428,263 (includes a $122,152 bonus) |
| 2003 | $343,713 (includes a $95,196 bonus) |

79.    Upon information and belief, Turner received the following backdated options: (i) an option grant dated February 4, 1994 to purchase at least 160,000 shares of Atmel common stock at the exercise price of $2.29; (ii) an option grant dated October 9, 1998 to purchase at least 100,000 shares of Atmel common stock at the exercise price of $1.9844; and (iii) an option grant dated July 16, 1999 to purchase at least 40,000 shares of Atmel common stock at the exercise price of $7.8281.

80.    Upon information and belief, Turner is a citizen of the State of California.

**Defendant Pruniaux**

81.    Defendant Bernard Pruniaux ("Pruniaux") has served as the Company's Vice President and General Manager, ASIC Segment since November 2001. Pruniaux also served as the Chief Executive Officer of the Company's Atmel Rousset S.A. subsidiary from May 1995 to November 2001.

82.    Pruniaux received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2005 | $407,069 (includes a $118,753 bonus) |
| 2004 | $403,979 (includes a $127,970 bonus) |
| 2003 | $224,680 (includes a $24,115 bonus) |

83.    Upon information and belief, Pruniaux received an option grant backdated to October 9, 1998, to purchase at least 200,000 shares of Atmel common stock at the exercise price of $1.9844.

1    84.  .   Upon information and belief, Pruniaux is a citizen of the State of California.

2  **Defendant Schumann**

3    85.    Defendant Steven Schumann ("Schumann") has served as the Company's Vice

4  President and General Manager, Non-Volatile Memory Segment since January 2002.  Schumann

5  also served in various positions since he joined the Company in 1985, including as the Company's

6  Vice President of Non-Volatile Memory Products from February 1996 to January 2002.

7    86.    Upon information and belief, Schumann received the following backdated options:

8  (i) an option grant dated February 22, 1994, to purchase at least 192,000 shares of Atmel common

9  stock at the exercise price of $3.8516; and (ii) an option grant dated October 9, 1998 to purchase at

10  least 192,000 shares of Atmel common stock at the exercise price of $1.9844.

11    87.    Upon information and belief, Schumann is a citizen of the State of California.

12  **Defendant Ross**

13    88.    Defendant Mike Ross ("Ross") served as the Company's General Counsel from

14  1989 until his resignation in August 2006.  He also served as Vice President, General Counsel and

15  Assistant Secretary until August 2006.

16    89.    Upon information and belief, Ross is a citizen of the State of California.

17  **Individual Defendants**

18    90.    Collectively, defendants George Perlegos, Thomas, Fougere, Kim, Hall, Gust

19  Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux, Schumann and

20  Ross are referred to herein as the "Individual Defendants."

21  **DUTIES OF THE INDIVIDUAL DEFENDANTS**

22    91.    By reason of their positions as officers and/or directors of the Company and because

23  of their ability to control the business and corporate affairs of the Company, the Individual

24  Defendants, particularly George Perlegos, Gust Perlegos, Chellam, Ross, Hall, Thomas, Fougere

25  and Kim, owed the Company and its shareholders the fiduciary obligations of good faith, trust,

26  loyalty and due care, and were and are required to use their utmost ability to control and manage

27  the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are

28  required to act in furtherance of the best interests of the Company and its shareholders so as to

benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

92.     Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

93.     To discharge their duties, Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim, as the officers and directors of the Company, were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

   a.     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

   b.     exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

   c.     exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports, or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

   d.     exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

   e.     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

94.     The Individual Defendants, particularly George Perlegos, Gust Perlegos, Chellam, and Audit Committee members Hall, Thomas, Fourgere and Kim, were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    17

GAAP, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

    a.    make and keep books, records and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

    b.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

        i.    transactions are executed in accordance with management's general or specific authorization; and

        ii.    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

### DUTIES AND RESPONSIBILITIES OF THE AUDIT, COMPENSATION AND GOVERNANCE AND NOMINATING COMMITTEES

95.    The standing committees of the Board include: (i) the Audit Committee; (ii) the Compensation Committee; and (iii) the Governance and Nominating Committee.

96.    These Committees set the policies which admittedly permitted the backdating of options to occur.

### *Compensation Committee*

97.    The following directors served on the Compensation Committee of the Atmel Board at certain times during the relevant period:

| Compensation Committee | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Hall | M | M | M | M | M | M | M | M | M | |
| Thomas | M | M | M | M | M | M | M | M | M | M |
| Fougere | | | | M | M | M | M | M | M | M |
| Kim | | | | | | M | | | | |
| # of Meetings | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 3 | 2 | |
| M = Member | | | | | | | | | | |

98.    According to the Company's Compensation Committee Charter, the Compensation Committee's responsibilities include:

    •    Annually reviewing and approving for the CEO and the executive officers of the Company: (i) the annual base salary, (ii) the annual incentive bonus, (iii) equity compensation, (iv) any employment agreement…(v) any signing

bonus…(vi) any other benefits, compensation or arrangements. One of the Compensation Committee's objectives shall be to use compensation to align the interests of the executive officers with the long-term interests of the Company's stockholders, thereby incentivizing management to increase shareholder value;

\*       \*       \*

• Acting as Administrator of the Company's equity compensation plans for its employees;

• Providing oversight of the Company's overall compensation plans and benefits programs and making recommendations to the Board with respect to improvements or changes to such plans or the adoption of new plans when appropriate….

### Audit Committee

99. The following directors served on the Audit Committee of the Atmel board at certain times during the relevant period:

| Audit Committee | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|---|---|---|---|
| Hall | M | M | M | M | M | M | M | | |
| Thomas | M | M | M | M | M | M | M | M | M |
| Fougere | | | | M | M | M | M | M | M |
| Kim | | | | | | M | M | M | ,M |
| # of Meetings | 2 | 1 | 2 | 2 | 2 | 6 | 6 | 20 | 25 |
| M = Member | | | | | | | | | |

100. Atmel's Audit Committee Charter provides that the Audit Committee shall, among other things:

• Review and discuss with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

• Direct the Company's independent auditors to review before filing with the SEC the Company's interim financial statements included in Quarterly Reports on Form 10-Q, using professional standards and procedures for conducting such reviews;

• Conduct a post-audit review of the financial statements and audit findings, including any suggestions for improvements provided to management by the independent auditors, and management's response to such suggestions; and

• Review, prior to announcement, Company press releases and other disclosures containing financial information for the purpose of ensuring that such press releases and other disclosures properly disclose financial information

presented in accordance with GAAP and, to the extent pro forma information is included, adequately disclose how such pro forma information differs from the comparable GAAP information and ensure that disclosure of such pro forma information is not given undue prominence and that such pro forma information does not provide a misleading presentation of the Company's results of operations or financial condition.

### *Governance and Nominating Committee*

101.   The following directors served on the Corporate Governance and Nominating Committee at certain times during the relevant period:

| Corporate Governance and Nominating Committee | | |
|---|---|---|
| | 2004 | 2005 |
| Thomas | M | M |
| Kim | M | M |
| # of Meetings | 0 | 2 |
| M = Member | | |

102.   According to the Company's Corporate Governance and Nominating Committee Charter, its duties are to:

- Develop principles of corporate governance and recommend them to the Board for its consideration and approval;

\*       \*       \*

- Review governance-related stockholder proposals and recommend Board responses; and

- Oversee compliance by the Board and its committees with applicable laws and regulations, including those promulgated by the Securities and Exchange Commission and the NASDAQ Rules.

\*       \*       \*

- Oversee the Board evaluation process including conducting periodic evaluations of the performance of the Board as a whole and each Board committee and evaluating the performance of Board members eligible for re-election;

- Review and make recommendations to the Board regarding the composition and size of the Board and determine the relevant criteria (including any minimum qualifications) for Board membership including issues of character integrity, judgment, diversity, age, independence, skills, education, expertise, business acumen, business experience, length of service, understanding of the Company's business, other commitments and the like....

**Director Compensation**

103.    According to the Company's 2005 and 2006 Proxy Statements, employee directors receive no cash compensation for service on the Board, while "each non-employee Director received $60,000 for service on the Board of Directors and its Committees." Defendant Fougere also received an extra $1,500 per month during 2002 through 2005 for travel and related costs incident to his French residence for attendance at Board and Committee meetings. According to the Company's March 24, 2003 Proxy Statement, in 2002 and 2003, non-employee directors received cash compensation of $5,000 per month for service on the Board.

## BACKGROUND

### Background of the Stock Option Backdating Scandal

104.    Under accounting rules in effect prior to 2004, public companies in the United States were permitted to grant stock options to employees without recording an expense, as long as the option's strike price was at or above the market's closing price for the stock on the day the options were granted. If the option granted was priced below the market price on the date granted (known as an in-the-money option grant), SEC regulations required that any publicly traded company recognize and record the difference as a compensation expense in its financial statements. *See, e.g.*, APB 25, superseded in 2004 by FAS 123(R).    Accounting rules also required that companies recognize the same compensation expense if in-the-money options were granted to non-employees. Thus, while in-the-money stock options are more valuable to those to whom they are granted, the additional expenses, if disclosed, reduce the total amount of net income reported to shareholders of a publicly traded company.

105.    In addition, pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's most highly compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors; (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the

1    compensation; and (iv) before any payment of such compensation, the compensation committee
2    certifies that the performance goals and any other material terms were in fact satisfied.

3    106.    Since the date of *The Wall Street Journal* article which first revealed the unlawful
4    practice of backdating stock options, more than 130 companies have reported internal and/or
5    governmental investigations of their backdating practices. "Perfect Payday Options Scorecard,"
6    *The Wall Street Journal, at* http://online.wsj.com/public/resources/documents/info-optionsscore06-
7    full.html.

8    107.    Additional research by Professor Lie suggests that between 1996 and 2005, 18.9%
9    of unscheduled option grants to top executives were backdated or manipulated by nearly one-third
10   of the companies investigated.

11   108.    As the public scrutiny has intensified, backdating has been revealed not only as a
12   practice to maximize the grant recipients' gain, while concealing company expenses, but also as a
13   tax avoidance vehicle for some executives. Reporting on an analysis written by an economist at
14   the SEC, the *San Jose Mercury News* reported, "[i]n a new wrinkle in the scandal over backdating
15   stock options, an analyst has found evidence that some executives manipulated the exercise dates
16   of their options in order to cheat on their taxes." Marcy Gordon, *SEC: Backdating Done to Avoid*
17   *Paying    More    Taxes*,    San    Jose    Mercury    News,    Dec.    13,    2006,    *at*
18   http://www.mercurynews.com/search/ci_4831931.

19   109.    Indeed, like the stock option grants examined by *The Wall Street Journal*, the
20   pattern of option grants identified at Atmel is more than randomly fortuitous, and the more likely
21   reason for the extraordinary pattern is that the stock options were improperly backdated.

22                                   **Atmel's Stock Option Plans**

23   110.    During the relevant period that the defendants engaged in their secret scheme to
24   backdate stock options, Atmel had three stock option plans in effect at various times – the 1986
25   Incentive Stock Option Plan, the 1996 Stock Plan and the 2005 Stock Plan (the "Plans"):

26                          **1986 Incentive Stock Option Plan (the "1986 Plan")**

27   111.    According to the Company's proxy statements, the 1986 Plan permits participation
28   by employees and consultants of the Company. Each option was evidenced by a stock option

agreement between the Company and the employee or consultant to whom such option was granted.

112.    The Company's proxy statements also stated that the 1986 Plan was administered by the Compensation Committee. The 1986 Plan does not permit the delegation of such authority.

113.    Further, the exercise price of option grants under the 1986 Plan was determined by the Compensation Committee. The 1986 Plan provides for the grant of stock options to employees and consultants, which vest generally over four years and "are granted at fair market value on the date of the grant."

### 1996 Stock Plan (the "1996 Plan")

114.    The 1996 Plan provides for the grant of stock options to employees and consultants. Incentive stock options under the 1996 Plan, however, may only be granted to Atmel employees. Each option was evidenced by a stock option agreement between the Company and the employee or consultant to whom such option was granted.

115.    The Company's proxy statements also stated that the 1996 Plan was administered by the Compensation Committee. The 1996 Plan does not permit the delegation of such authority.

116.    Further, the exercise price of option grants under the 1996 Plan was determined by the Compensation Committee. The 1996 Plan provides that "the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant," where fair market value is defined as "the closing sale price for the Common Stock (or the closing bid if no sales were reported) on the last market trading day prior to the date the option is granted."

### 2005 Stock Plan (the "2005 Plan")

117.    The 2005 Plan provides for the grant of stock options to employees, directors and consultants. Each option was evidenced by a stock option agreement between the Company and the employee or consultant to whom such option was granted.

118.    The Company's proxy statements also stated that the 2005 Plan was administered by the Compensation Committee. The 2005 Plan does not permit the delegation of such authority.

119.    Further, the exercise price of option grants under the 2005 Plan was determined by the Compensation Committee. The 2005 Stock Plan provides that the exercise price of incentive

1  stock options "shall be no less than 100% of the Fair Market Value per Share on the date of grant,"

2  where fair market value is defined as "[i]f the Common Stock is listed on any established stock

3  exchange or a national market system, including without limitation the NASDAQ National Market

4  or The NASDAQ SmallCap Market of The NASDAQ Stock Market, . . . the closing sales price for

5  such stock (or the closing bid, if no sales were reported) as quoted on such exchange or system for

6  the last market trading day prior to the time of determination."

7       120.    According to Atmel's proxy statements, at all times relevant hereto the

8  Compensation Committee "generally review[ed] and approve[d] [the Company's] executive

9  compensation policies," including administration of the Company's stock option plans. However,

10  as disclosed in the 2003 proxy statement, "[i]n fiscal 2003, the Board of Directors, as a whole,

11  assumed these responsibilities."

12       121.    As disclosed in the Report of the Compensation Committee in the Atmel's proxy

13  statements, George Perlegos attended all Compensation Committee meetings from 1994 to 2003.

14  Furthermore, Chellam, Atmel's CFO, attended all Compensation Committee meetings from 1994

15  to 1997. At the Compensation Committee meetings, George Perlegos and/or Chellam "provide[d]

16  background and market information and make recommendations to the Compensation Committee

17  on salary levels, officer performance objectives and corporate financial goals."

18  **SUBSTANTIVE ALLEGATIONS**

19  **Backdating of Atmel Stock Option Grants**

20       122.    As discussed below, all thirteen discretionary grant dates from February 1994

21  through April 2003 were backdated as the pattern of grants was more than fortuitous – eight were

22  made at or near the lowest price of the fiscal year, and nine were made at or near the lowest price

23  of the fiscal quarter.

24       123.    Further, Merrill Lynch & Co., Inc. ("Merrill Lynch") also published an analysis of

25  options grants made at various companies in a report dated May 22, 2006 as further evidence that

26  the returns enjoyed by options grantees at many companies were not by mere chance. The report

27  analyzes the twenty day performance of each option grant reported in a company's proxy

28  statements during the relevant backdating period. The analysis also calculates the annualized

1  return of the option grants at twenty days after the grant and compares that annualized return with

2  the company's overall annual return.

3    124. An application of the Merrill Lynch analysis for each of the thirteen discretionary

4  grants made to the defendants further indicates that the grants were backdated as the vast

5  discrepancies between the annualized management and annualized investors returns can only be

6  explained by a practice of backdating.  For example, the average annualized return to management

7  on the option grants identified in the relevant proxy statements for calendar years 1994 to 2003 is

8  335.5%, as compared to 44.16% average annualized return to investors − a difference of 291.35%.

9  Furthermore, the management's return is *over seven times* the return to investors.

10    125. From 1994 to 2006, the Compensation Committee and certain directors (Defendants

11  George Perlegos, Hall, Thomas, Fougere and Kim) knowingly and deliberately violated the terms

12  of the 1986 Plan, the 1996 Plan, the 2005 Plan, APB 25 and Section 162(m) by knowingly and

13  deliberately backdating grants of stock options to make it appear as though the grants were made

14  on dates when the market price of Atmel stock was lower than the market price on the actual grant

15  dates, thereby unduly benefiting the recipients of the backdated options.  Defendants George

16  Perlegos, Hall, Thomas, Fougere and Kim knew that the publicly reported grant dates and

17  statements that the Company followed APB 25 and granted options with exercise prices equal to

18  the fair market value of Atmel stock on the date of grant were false because the grants were in fact

19  backdated.  Defendants George Perlegos, Hall, Thomas, Fougere and Kim knowingly and

20  deliberately approved the backdating scheme with knowledge of its consequences, e.g., its effects

21  on Atmel's financial statements, especially because Hall, Thomas, Fougere and Kim were also on

22  the Audit Committee and reviewed and oversaw the filing of Atmel's financial results.

23    126. Between 1994 and 2006, the defendants repeated in proxy statements that the stock

24  option grants made during that period carried an exercise price that was "equal the fair market

25  value on the date of grant."  However, until 2006, the defendants concealed that the stock option

26  grants were repeatedly and consciously backdated to ensure that the strike price associated with the

27  option grants was below fair market value.  Upon information and belief, the Board members and

28  the Compensation Committee members, including defendants George Perlegos, Hall, Thomas,

Fougere and Kim, who issued the grants, and certain defendants (listed herein), would review historical stock prices before issuing stock options to select a grant date when the stock prices was significantly below the current market price. They would then falsify the relevant documents to make it appear as if the stock options were granted on the earlier date.

127.    As a result, the executive to whom the options were granted could realize the gain observed between the historical and actual grant date while the Company's records would appear to show no difference between the option price and the market price on the purported date of the grant, thereby avoiding both the reporting requirement and the additional compensation expense.

128.    In addition, in order to maximize remuneration to its officers and employees, and to attract non-employee executives to the Company's ranks without impacting its reported income, the Defendants engaged in a practice of backdating the issue date of stock options to certain key personnel and other Atmel employees as the defendants admitted in the Company's October 30, 2007 and April 30, 2007 press releases.

129.    According to the Company's April 30, 2007 press release, George "Perlegos was aware of, and often directed, the backdating of stock option grants.    The evidence included handwritten notations from [Perlegos] expressly directing stock administration employees to use prior Board meeting dates for many employees' stock option grants."

130.    Furthermore, in April 30, 2007 press release, the Company implicated Ross, who "handled communications with the Board of Directors regarding stock options and, during certain periods, supervised Atmel's stock administration department."    The Audit Committee concluded that Ross was aware of and participated in the backdating scheme and actually "directed stock administration employees to issue backdated stock option grants to employees and directed or permitted other actions to be taken," in knowing contravention of the terms of Atmel's stock option plans.

131.    The press release further stated that both George Perlegos and Ross were also well aware that this practice of backdating was a violation of the option plans and that the grant date should be set at the date of Board approval.

132.    George Perlegos decided as a matter of corporate policy to backdate stock options, and Defendants Hall, Thomas, Fougere and Kim, as the Compensation Committee members during the relevant period, knowingly approved and carried out the policy.  Defendants Hall, Thomas, Fougere and Kim were involved in these option granting practices and knew that the stock option grant dates were not the actual dates they approved them.  Also, as Audit Committee members, Defendants Hall, Thomas, Fougere and Kim knowingly participated in the dissemination of false financial statements and knowingly concealed the backdating scheme by filing false proxy statements.

## **Backdating of Stock Option Grants**

1994 Stock Option Grants

133.    The Compensation Committee had the sole authority to choose the date and, in fact, did choose the date on which these stock options were granted.  For the purported February 4, 1994 stock option grants, Defendants Hall and Thomas, as Compensation Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

134.    Defendants Hall and Thomas were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant.  Defendants Hall and Thomas approved these grants on a date after the reported grant date and knowingly used hindsight to select the dates when Atmel's stock was at or near its quarterly and yearly lows.  Defendants Hall and Thomas knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

135.    Defendants Hall and Thomas granted Chellam, Peckham and Turner stock options dated February 4, 1994, knowing that February 4, 1994 was not the date they actually approved the grants.  The February 4, 1994 grants were approved by Hall and Thomas on a later date, occurring between the next trading day on February 5, 1994 and the end of the fiscal year.  Moreover, Defendants George Perlegos, Gust Perlegos, Ross and Chellam knowingly approved and participated in the backdating of the February 4, 1994 grant because of their positions and knowledge of the Company as they were intimately involved in its management.  Specifically,

George and Gust Perlegos are the co-founders of Atmel, George Perlegos was President, CEO and Chairman, Gust Perlegos was Vice President and General Manager of the Company, Chellam was Atmel's CFO, and Ross was the Company's General Counsel. Furthermore, as disclosed in the 1994 proxy statement, George Perlegos and Chellam had also been present at the Compensation Committee meetings where the option grants were approved.

136.    The February 4, 1994 grants to Chellam, Peckham and Turner coincided with one of Atmel's lowest closing price of the entire fiscal quarter and year, as shown below. Atmel stock price had increased $1.90, or 82.9%, by the end of the year.





| Purported Date of Grant | Name | Exercise Price | Number of Options[1] | Adjusted Exercise Price[2] | Adjusted Number of Options |
|---|---|---|---|---|---|
| 02/04/94 | Chellam | $18.31 | 16,000 | $2.29 | 128,000 |
| | Peckham | $18.31 | 20,000 | $2.29 | 160,000 |
| | Turner | $18.31 | At least 20,000 | $2.29 | At least 160,000 |

1995 Stock Option Grants

137.    The Compensation Committee had the sole authority to choose the date and, in fact, did choose the date on which these stock options were granted.   For the purported February 22, 1995 stock option grants, Defendants Hall and Thomas, as Compensation Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

138.    Defendants Hall and Thomas were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant.   Defendants Hall and Thomas approved these grants on a date after the reported grant dates and knowingly used hindsight to select the dates when Atmel's stock was at or near its quarterly and yearly lows. Defendants Hall and Thomas knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

139.    Defendants Hall and Thomas granted Gust Perlegos, Wu, Chellam, Peckham and Schumann stock options purportedly on February 22, 1995, knowing that February 22, 1995 was not the date that they approved the grant. Moreover, Defendants George Perlegos, Gust Perlegos, Ross and Chellam knowingly approved and participated in the backdating of the February 22, 1995 grant, and as disclosed in the 1995 proxy statement, George Perlegos and Chellam had also been present at the Compensation Committee meetings where the option grants were approved.

---

[1] Where the total number of options is unknown, *i.e.* where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

[2] All adjusted exercise prices and adjusted number of options are adjusted for the Company's stock option splits effective April 12, 1994, August 9, 1995, December 20, 1999 and August 28, 2000.

Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall and Thomas knew that the February 22, 1995 grant was approved by Hall and Thomas on a later date, occurring between the next trading day on February 22, 1995 and the end of the fiscal year.

140.    The February 22, 1995 grant to Gust Perlegos, Wu, Chellam, Peckham and Schumann coincided with the absolutely lowest closing price of the entire quarter and year and rose by $1.74, or 45.2%, by the end of the year:





| Purported Date of Grant | Name | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 02/22/95 | Gust Perlegos | $15.406 | 80,000 | $3.8516 | 320,000 |
| | Wu | $15.406 | 80,000 | $3.8516 | 320,000 |
| | Chellam | $15.406 | 20,000 | $3.8516 | 80,000 |
| | Peckham | $15.406 | 20,000 | $3.8516 | 80,000 |
| | Schumann | $15.406 | At least 96,000 | $3.8516 | At least 384,000 |

1997 Stock Option Grants

141.    The Compensation Committee had the sole authority to choose the date and, in fact, did choose the date on which these stock options were granted.   For the purported April 11, 1997 stock option grants, Defendants Hall and Thomas, as Compensation Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

142.    Defendants Hall and Thomas were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant and nevertheless approved these grants on a date after the reported grant dates when Atmel's stock was at a historical low.  Defendants Hall and Thomas knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

143.    Defendants Hall and Thomas granted stock options to Gust Perlegos, Wu, Chellam and Peckham that were backdated to April 11, 1997 with the knowledge that April 11, 1997 was not the date that they approved the grants.  Furthermore, Defendants George Perlegos, Gust Perlegos, Ross and Chellam also knew that the grants were backdated, and as disclosed in the 1997 proxy statement, George Perlegos and Chellam attended the Compensation Committee where the grants were approved.  The April 11, 1997 grant to Gust Perlegos, Wu, Chellam and Peckham followed a sharp drop in Atmel stock price and continued to increase significantly.

144.    The actual grant date of the April 11, 1997 grants is between the next trading date of April 12, 1997 and the September 12, 1997, the date of highest closing price before the end of the year, by which time, the stock price rose $3.67, or 60.25%, as shown below:







| Purported Date of Grant | Name | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 04/11/97 | Gust Perlegos | $24.375 | 40,000 | $6.0938 | 160,000 |
| | Wu | $24.375 | 40,000 | $6.0938 | 160,000 |
| | Chellam | $24.375 | 40,000 | $6.0938 | 160,000 |
| | Peckham | $24.375 | 40,000 | $6.0938 | 160,000 |

<u>1998 Stock Option Grants</u>

145.    The Compensation Committee had the sole authority to choose the date and, in fact, did choose the date on which these stock options were granted.  For the purported October 9, 1998 stock option grants, Defendants Hall and Thomas, as Compensation Committee members, had the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          32

1   sole authority to administer the stock option plans and grant stock options thereunder and knew

2   that the stock option plans did not allow for delegation of their authority.

3       146.    Defendants Hall and Thomas were aware that the stock option plans required that

4   stock options be granted at not less than fair market value on the date of grant.    Defendants Hall

5   and Thomas approved these grants on a date after the reported grant date and knowingly used

6   hindsight to select a date when Atmel's stock was at or near its quarterly and yearly lows.

7   Defendants Hall and Thomas knew that backdating option grants to a date with a lower price

8   violated the Company's stock option plans.

9       147.    Defendants Hall and Thomas granted stock options to Pruniaux, Schumann and

10  Turner that were backdated to October 9, 1998.  Hall and Thomas knew that October 9, 1998 was

11  not the date that they approved the grant and thus approved the backdating of the October 9, 1998

12  grants.  Defendants George Perlegos, Ross and Gust Perlegos, because of their positions with the

13  Company and George Perlego's participation in the Compensation Committee meetings, also knew

14  that the October 9, 1998 grant was granted at a later date.  The actual grant date of the October 9,

15  1998 grants is between the next trading date of October 13 1998 and December 31, 1998.

16      148.    The October 9, 1998 grants to Pruniaux, Schumann and Turner coincided with one

17  of Atmel's lowest closing prices of the entire fiscal quarter and year, as demonstrated below.  After

18  the grants, the stock price rose $1.84, or 92.9%, by the end of the year.

19

20

21

22                

23

24

25

26

27

28

**Fiscal Year 1998**

10/09/98
$1.9844

— Adjusted* Close    O Adjusted* Grant Price

| Purported Date of Grant | Name | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 10/09/98 | Pruniaux | $1.98 | At least 200,000 | $1.9844 | At least 200,000 |
| | Schumann | $1.98 | At least 192,000 | $1.9844 | At least 192,000 |
| | Turner | $1.98 | At least 100,000 | $1.9844 | At least 100,000 |

1999 Stock Option Grants

149.    The Compensation Committee had the sole authority to choose the date and, in fact, did choose the date on which these stock options were granted.  For the purported February 12, 1999 stock option grant, Defendants Hall and Thomas, as Compensation Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

150.    Defendants Hall and Thomas were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant.   Defendants Hall and Thomas approved this grant on a date after the reported grant date and knowingly used hindsight to select a date when Atmel's stock was at or near its quarterly and yearly lows. Defendants Hall and Thomas knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

151.    Defendants Hall and Thomas granted stock options to defendant Colvin purportedly on February 12, 1999.  However, both Hall and Thomas who approved the grant knew that

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

34

February 12, 1999 was not the actual date of their approval of the grant, which actually took place at a later date — sometime between February 18, 1999 and June 10, 1999, the day before the next stock option grant. Because of their involvement in the running of the Company, defendants George Perlegos, Ross and Gust Perlegos also knew that the February 12, 1999 grant to Colvin was backdated.

152. Further, the February 12, 1999 grant coincided with one of Atmel's lowest closing prices of the entire fiscal quarter and year, as shown below.





| Purported Date of Grant | Name | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 02/12/99 | Colvin | $7.344 | 20,000 | $3.6719 | 40,000 |

153.    The Compensation Committee had the sole authority to choose the date and, in fact, did choose the date on which these stock options were granted.  For the purported June 11, 1999 stock option grant, Defendants Hall and Thomas, as Compensation Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority and required that stock options be granted at not less than fair market value on the date of grant.  Defendants Hall and Thomas knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

154.    Defendants Hall and Thomas granted stock options to defendant Sisois purportedly on June 11, 1999 when Hall and Thomas knew that June 11, 1999 was not the date they had approved the grant and that the stock options to Sisois were actually granted at a later date. Furthermore, because of their involvement in the backdating scheme, defendants George Perlegos, Ross and Gust Perlegos also knew that the June 11, 1999 grant to Sisois was backdated.

155.    The actual grant date of the June 11, 1999 grants is estimated to be between June 12, 1999 and July 15, 1999, the day before the next stock option grant at which point the stock price increased by $2.13, or 35.98%.



1

2

3

4

5

6

7

8

9



10

11

12

| Purported Date of Grant | Name | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 06/11/99 | Sisois | $11.813 | 40,000 | $5.91 | 120,000 |

13      156.    The Compensation Committee had the sole authority to choose the date and, in fact,

14   did choose the date on which these stock options were granted. For the purported July 16, 1999

15   stock option grants, Defendants Hall and Thomas, as Compensation Committee members, had the

16   sole authority to administer the stock option plans and grant stock options thereunder and knew

17   that the stock option plans did not allow for delegation of their authority and required that stock

18   options be granted at not less than fair market value on the date of grant. Furthermore, Defendants

19   Hall and Thomas knew that backdating option grants to a date with a lower price violated the

20   Company's stock option plans.

21      157.    Defendants Hall and Thomas granted stock options to defendants Colvin, Katz and

22   Turner backdated to July 16, 1999. However, both Hall and Thomas who approved the grants

23   knew that July 16, 1999 was not the date of their approval of the grants, which actually took place

24   at a later date—sometime between August 4, 1999 and December 13, 1999. Because of their

25   involvement in the running of the Company, defendants George Perlegos, Ross and Gust Perlegos

26   were also well aware that July 16, 1999 was not the actual grant date.

27

28

158.    After July 16, 1999, Atmel stock price increased by $6.95, or 88.82%, by the end of the year.





| Purported Date of Grant | Name | Exercise Price | Number of Options | Adjusted Exercise Price | Adjusted Number of Options |
|---|---|---|---|---|---|
| 07/16/99 | Colvin | $15.656 | 40,000 | $7.8281 | 80,000 |
| | Katz | $15.656 | 10,000 | $7.8281 | 20,000 |
| | Turner | $15.656 | At least 20,000 | $7.8281 | At least 40,000 |

2000 Stock Option Grant

159.    The Compensation Committee had the sole authority to choose the date and, in fact, did choose the date on which these stock options were granted. For the purported November 17, 2000 stock option grant to Colvin, Defendants Hall, Thomas and Fougere, as Compensation

Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

160.     Defendants Hall, Thomas and Fougere were also aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Furthermore, Defendants Hall, Thomas and Fougere knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

161.     Compensation Committee members Hall, Thomas and Fougere granted stock options to defendant Colvin purportedly on November 17, 2000, which Hall, Thomas and Fougere as well as defendants George Perlegos, Ross and Gust Perlegos knew was not the actual grant date. The actual date of the Compensation Committee's approval occurred between December 8, 2000 and December 31, 2000. Further, the grant coincided with one of Atmel's lowest closing prices of the entire fiscal year, as demonstrated below:



1
2
3
4
5
6
7
8
9



10
11
12

| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 11/17/00 | Colvin | $12.125 | 40,000 |

13

2001 Stock Option Grant

14    162.    The Compensation Committee had the sole authority to choose the date and, in fact,

15  did choose the date on which these stock options were granted.   For the purported September 17,

16  2001 stock option grant to Colvin, Defendants Hall, Thomas and Fougere, as Compensation

17  Committee members, had the sole authority to administer the stock option plans and grant stock

18  options thereunder and knew that the stock option plans did not allow for delegation of their

19  authority.

20    163.    Defendants Hall, Thomas and Fougere were aware that the stock option plans

21  required that stock options be granted at not less than fair market value on the date of grant.

22  Furthermore, Defendants Hall, Thomas and Fougere knew that backdating option grants to a date

23  with a lower price violated the Company's stock option plans.

24    164.    Defendants Hall, Thomas and Fougere, as Compensation Committee members,

25  granted Colvin stock options dated September 17, 2001, knowing that it was not the date they

26  actually approved the grant.   With the knowledge George Perlegos, Ross and Gust Perlegos,

27  Defendants Hall, Thomas and Fougere actually approved the September 17, 2001 grant on a later

28

date, occurring between October 4, 2001 and the end of the fiscal year. The September 17, 2001 grant to Colvin coincided with one of Atmel's lowest closing price of the entire year:





| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 09/17/01 | Colvin | $7.12 | 100,000 |

2002 Stock Option Grants

165.    The Compensation Committee had the sole authority to choose the date and, in fact, did choose the date on which these stock options were granted. Thus, for the purported February 14, 2002 stock option grants, Defendants Hall, Thomas, Fougere and Kim, as Compensation Committee members, had the sole authority to administer the stock option plans and grant stock

1    options thereunder and knew that the stock option plans did not allow for delegation of their

2    authority and required that stock options be granted at not less than fair market value on the date of

3    grant.    Furthermore, Defendants Hall, Thomas, Fougere and Kim knew that backdating option

4    grants to a date with a lower price violated the Company's stock option plans.

5           166.    Defendants Hall, Thomas, Fougere and Kim with the knowledge of George Perlegos

6    and Gust Perlegos, approved stock options to defendants Gust Perlegos and Wu with a purported

7    grant date of February 14, 2002.    Compensation Committee members Hall, Thomas, Fougere and

8    Kim as well as defendants George Perlegos, Ross and Gust Perlegos knew that February 14, 2002

9    was not the date they approved the grants.    The actual grant date is some time between February

10   18, 2002 and April 16, 2002, the highest closing price before the next grant date.    Furthermore, the

11   February 14, 2002 option grant coincided with the lowest price of the fiscal quarter.



**First Quarter - 2002**

02/14/02, $7.69

1
2
3
4
5
6
7
8
9



| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 02/14/02 | Gust Perlegos | $7.69 | 100,000 |
| | Wu | $7.69 | 100,000 |

167.    For the purported July 11, 2002 stock option grants, Defendants Hall, Thomas, Fougere and Kim, as Compensation Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

168.    Defendants Hall, Thomas, Fougere and Kim were all aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Furthermore, Defendants Hall, Thomas, Fougere and Kim knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

169.    Defendants Hall, Thomas, Fougere and Kim with the knowledge of George Perlegos, Gust Perlegos and Ross, granted to defendant Sisois backdated stock options with a purported grant date of July 11, 2002, which they all knew was not the date they approved the grants. After July 11, 2002, the stock price increased 8% in just three trading days, so the actual grant date is estimated to be between July 12, 2002 and July 17, 2002.





| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 07/11/02 | Sisois | $5.13 | 30,000 |

170.    Prior to the enactment of the Sarbanes-Oxley Act of 2002 ("SOX"), Defendants George Perlegos, Gust Perlegos, Chellam, Ross, Hall, Thomas, Fougere and Kim were able to engage in backdating of option grants with relative ease because under federal law, they were only required to report option grants to the SEC once a year.

171.    Pursuant to SOX, beginning on August 29, 2002, executives and directors are required to report option grants to the SEC within two days of the grant. Despite this new requirement, these defendants continued to backdate option grants.

172.    For example, although defendants Gust Perlegos, Wu, Colvin, and Sisois were required to report their November 14, 2002 grants to the SEC within two days, they did not do so in any form 4 filings, and the late reporting of grants lends itself to backdating and is also an indication of backdating.

173.    For the purported November 14, 2002 stock option grants, Defendants Hall, Thomas, Fougere and Kim, as Compensation Committee members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

174.    Defendants Hall, Thomas, Fougere and Kim were all aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Hall, Thomas, Fougere and Kim approved these grant on a date after the reported grant date and knowingly used hindsight to select a date when Atmel's stock was at or near its quarterly and yearly lows.  Furthermore, Defendants Hall, Thomas, Fougere and Kim knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

175.    Defendants Hall, Thomas, Fougere and Kim with the knowledge of George Perlegos, Gust Perlegos and Ross, granted to defendants Gust Perlegos, Wu, Colvin, and Sisois backdated stock options with a purported grant date of November 14, 2002.   Compensation Committee members Hall, Thomas, Fougere and Kim as well as defendants George Perlegos, Gust Perlegos and Ross knew that November 14, 2002 was not the date they approved the grants.  The actual grant date is some time between November 15, 2002 and December 31, 2002.  Furthermore, the November 14, 2002 option grant coincided with one of Atmel's lowest stock prices of the entire year.





| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 11/14/02 | Gust Perlegos | $2.11 | 50,000 |
| | Wu | $2.11 | 100,000 |
| | Colvin | $2.11 | 50,000 |
| | Sisois | $2.11 | 40,000 |

176.    Similarly, although defendant Barton was required to report his purported April 30, 2003 grant to the SEC within two days, Barton did not do so until more than one year later on May 27, 2004 in a Form 4 filing.  In addition, the April 30, 2003 grant was not disclosed in a proxy statement until the 2003 proxy statement filed with the SEC on March 30, 2004.

177.    In 2003 as disclosed in a proxy statement, the entire Board administered the stock option plans.  For the purported April 30, 2003 stock option grant to Barton, Defendants George Perlegos, Hall, Thomas, Fougere and Kim, as Board members, had the sole authority to administer the stock option plans and grant stock options thereunder and knew that the stock option plans did not allow for delegation of their authority.

178.    Defendants George Perlegos, Hall, Thomas, Fougere and Kim were all aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant.    Furthermore, Defendants George Perlegos, Hall, Thomas, Fougere and Kim knew that backdating option grants to a date with a lower price violated the Company's stock option plans.

179.    Defendants George Perlegos, Hall, Thomas, Fougere and Kim granted defendant Barton 500,000 backdated stock options with a purported grant date of April 30, 2003.  As they administered the stock option plans in 2003, the entire Board (George Perlegos, Hall, Thomas, Fougere and Kim) as well as Gust Perlegos and Ross knew that the actual grant date occurred after April 30, 2003.    The actual grant date falls within the range of May 1, 2003 to March 30, 2004 when the grant was disclosed in the 2003 proxy statement.  Following the purported grant date, Atmel stock price increased $4.72, or 261%, by March 30, 2004, as reflected on the following graph:



| Purported Date of Grant | Name | Exercise Price[3] | Number of Options |
|---|---|---|---|
| 04/30/03 | Barton | $1.81 | 500,000 |

180.    The reason for the extraordinary pattern set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Rather, at the behest of the option recipients (Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann), Defendants Hall, Thomas, Fougere and Kim as well as George Perlegos, Gust Perlegos, Chellam and Ross improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Atmel stock was lower than the market price on the actual grant dates. This improper backdating, which violated the terms of the Plans, resulted in option grants with lower exercise prices, which improperly increased the value of the options to defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann and improperly reduced the amounts they had to pay the Company upon exercise of the options.

181.    In a striking pattern, 100% of the discretionary grants (13 grant dates) made from February 1994 to April 2003 were dated to coincide with historically low closing prices of Atmel common stock. In fact, 8 of the 13 grants were dated at or near yearly lows, and 9 of the 13 grants were dated at or near quarterly lows. The odds of hitting that many quarterly and yearly lows are astronomical and thus cannot be the result of "luck."

### Merrill Lynch Analysis

182.    The subject of options backdating has been the focus of numerous financial analysts and experts. One reputable source, Merrill Lynch, has set forth an analytical framework to determine whether options were backdated. The Merrill Lynch analysis is set forth in a May 22, 2006 report. The analysis analyzes the twenty day performance of each option grant reported in a company's proxy statements during the relevant backdating period. The analysis also calculates

---

[3]    The closing price on the last trading day prior to the purported grant date of April 30, 2003 was $1.86.

1    the annualized return of the option grants at twenty days after the grant and compares that
2    annualized return with the company's overall annual return.

3         183.    Accordingly, Plaintiff analyzed the February 4, 1994, February 22, 1995, April 11,
4    1997, February 12, 1999, June 11, 1999, July 16, 1999, November 17, 2000, September 17, 2001,
5    February 14, 2002, July 11, 2002, November 14, 2002 and April 30, 2003 stock option grants
6    disclosed in Atmel's proxy statements using the same analysis as Merrill Lynch. Backdating is
7    indicated under the Merrill Lynch analysis.

8         184.    Applying the Merrill Lynch analysis, the following result occurs: annualized
9    investor returns were 93.50% in 1994, 33.58% in 1995, -43.96% in 1997, 286.13% in 1999, -
10   21.35% in 2000, -36.60% in 2001, -69.74% in 2002, and 169.51% in 2003. Next, a comparison of
11   the twenty day and annualized returns to management on the subject grants was undertaken.

12        185.    Applying the Merrill Lynch analysis for the February 4, 1994 option grant, the
13   average twenty day return is 33.73%, or 607.21% annualized, as compared to 93.50% annualized
14   return to investors in 1994 – a difference of 513.71%.

15        186.    Applying the Merrill Lynch analysis for the February 22, 1995 option grant, the
16   average twenty day return is 16.48%, or 296.60% annualized, as compared to 33.58% annualized
17   return to investors in 1995 – a difference of 263.02%.

18        187.    Applying the Merrill Lynch analysis for the April 11, 1997 option grant, the average
19   twenty day return is 9.74%, or 175.37% annualized, as compared to -43.96% annualized return to
20   investors in 1997 – a difference of 219.33%.

21        188.    Applying the Merrill Lynch analysis for the option grants in 1999, the average
22   twenty day return is 18.80%, or 338.33% annualized, as compared to 286.13% annualized return to
23   investors in 1999 – a difference of 52.2%.

24        189.    Applying the Merrill Lynch analysis for the November 17, 2000 option grant, the
25   average twenty day return is 7.73%, or 139.18% annualized, as compared to -21.35% annualized
26   return to investors in 2000 – a difference of 160.53%.

27
28

190.   Applying the Merrill Lynch analysis for the September 17, 2001 option grant, the average twenty day return is 12.22%, or 219.94% annualized, as compared to -36.6% annualized return to investors in 2001 – a difference of 256.55%.

191.   Applying the Merrill Lynch analysis for the option grants in 2002, the average twenty day return is 0.21%, or 3.77% annualized, as compared -69.74% annualized return to investors in 2002 – a difference of 73.51%.

192.   Applying the Merrill Lynch analysis for the option grants in 2003, the average twenty day return is 50.2%, or 903.65% annualized, as compared to 165.51% annualized return to investors in 2003 – a difference of 734.14%.

193.   The average annualized return to management on the option grants identified in the relevant proxy statements for calendar years 1994 to 2003 is 335.5%, as compared to 44.16% average annualized return to investors – a difference of 291.35%. Furthermore, the management's return is *over seven times* the return to investors.

194.   The vast discrepancies between the annualized management and annualized investors' returns demonstrate that Atmel stock options were opportunistically granted to the Individual Defendants in order to provide them with greater financial gains on their Atmel stock options than were achieved in the open market. Such a dramatically beneficial pattern of option grant dates can only reasonably be explained by backdating.

### Atmel's Admission of Backdating and the Internal Investigation

195.   On October 30, 2006, Atmel issued a press release reporting the Audit Committee's preliminarily conclusion and *admitting that, under APB 25, "the actual measurement dates for certain stock options* differed *from the recorded measurement dates for such stock options."* The Company noted that the investigation was continuing, and stated that:

> Based on the Audit Committee's preliminary determination, the Company expects that the difference in these measurement dates will result in *material non-cash, stock-based compensation expenses. Any such charges would have the effect of decreasing net income or increasing net loss and increasing accumulated deficit as reported in the Company's historical financial statements.* Accordingly, on October 24, 2006, the Company's Audit Committee, after consultation with management, determined that the Company's financial statements for each of the three fiscal years in the period ended December 31, 2005, which are included in the Company's Annual Report on Form 10-K for the year ended December 31, 2005,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the financial statements for the interim periods contained in the Quarterly Reports on Form 10-Q filed with respect to each of these years, and the financial statements included in the Company's Quarterly Report on Form 10-Q for the first quarter of 2006, *should no longer be relied upon*. In addition, the restatement will affect financial statements for fiscal years prior to fiscal 2003 and, therefore, *financial statements for fiscal years prior to fiscal 2003 should also no longer be relied upon*. The Company expects to reflect the impact of the adjustments to those prior periods as an adjustment to the opening balances as of January 1, 2003 in the financial statements for the restatement period.

196.    The Company further admitted that:

Because the Audit Committee's investigation is ongoing, it has not identified all stock options for which the accounting measurement dates may have been incorrectly determined. As a result, the Company has not determined the final aggregate amount of additional stock-based compensation expenses that may need to be recorded or the amount of such expenses that may need to be recorded in any specific prior period or in any future period. Further, there can be no assurance that no other matters will come to the attention of the Audit Committee during the course of its investigation that will require additional adjustments to the Company's financial statements.

The Company has not yet determined the tax consequences that may result from these matters or whether tax consequences will give rise to monetary liabilities which may have to be satisfied in any future period.

Additionally, Atmel is evaluating Management's Report on Internal Control Over Financial Reporting as disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2005, but has not yet completed its analysis of the impact of this situation on its internal control over financial reporting.

197.    Then on April 30, 2007, the Company issued a press release reporting the findings of the Audit Committee investigation of its historical stock option practices:

Results of Audit Committee Investigation

The Audit Committee's investigation covered 112 stock option grants, consisting of over 10,000 individual stock option grants to approximately 4,250 recipients, for all grant dates during the period January 1, 1997 through August 3, 2006. The Audit Committee extended the scope of the original review by having the Company conduct an analysis of approximately 90 additional stock option grants that were made during the period March 19, 1991 (the date of the Company's initial public offering) through December 31, 1996.

In connection with the investigation, more than 1,000,000 pages of hard copy documents and over 600,000 electronic documents were analyzed, and 63 current and former directors, officers, and employees were interviewed. Based on the investigation, the Audit Committee concluded that:

- *93 of the 112 stock option grants during the period January 1, 1997 through August 3, 2006 included some options that were not issued on the date set forth in the company's stock option records*

- These incorrectly recorded stock option grants had incorrect measurement dates for financial accounting purposes and were not accounted for correctly in the Company's previously issued financial statements
- During 1998, in two separate stock option repricing programs, employees were allowed to elect stock options to be repriced after the stated repricing deadlines had expired
- There was evidence that the October 1998 stock option repricing offer was not communicated to employees until after the October 12, 1998 deadline to accept the repricing offer
- Certain employees were allowed to record stock option exercises on dates other than the actual transaction date, thereby potentially reducing the taxable gain to the employee and reducing the tax deduction available to the Company
- Stock option cancellation dates were changed to allow continued vesting and to allow employees to exercise stock options beyond the standard 30- day period following termination from the Company
- All of the above actions were taken without required approvals by the Board of Directors or the Compensation Committee of the Board of Directors
- Atmel's internal controls relating to the stock option granting process were inadequate, and there was an inadequate and inconsistent procedure at the Company for processing stock option grants.

The Audit Committee also found that after January 2004 the Company improved its stock option granting processes, and since that time, has generally granted stock options in accordance with the Company's stock option plans and approval procedures. The Company did not identify any material stock-based compensation adjustments that were required for periods after January 2004 . . . .

(emphasis added).

198.    In the April 30, 2007 press release, the Company implicated both George Perlegos and Ross in the backdating scheme at Atmel, as follows:

Evaluation of the Conduct of Management and the Board of Directors:

The Audit Committee considered the involvement of former and current members of management and the Board of Directors in the stock option grant process and concluded that: . . .

- The evidence did not give rise to concern about the integrity of any current officer
- The individuals who were primarily responsible for directing the backdating of stock options were George Perlegos, the Company's former Chief Executive Officer, and Mike Ross, the Company's former General Counsel. On August 5, 2006, Messrs. Perlegos and Ross were terminated for cause following an unrelated investigation into the misuse of corporate travel funds.
-- George Perlegos
  o   George Perlegos was one of the Company's founders, and was Atmel's Chief Executive Officer and Chairman of the Board from 1984 until August 2006. Based on evidence from the stock option investigation, the Audit Committee concluded that Mr. Perlegos was aware of, and often directed, the backdating of stock option grants. The evidence included handwritten notations from Mr. Perlegos expressly directing stock administration employees to use prior Board meeting dates for many employees' stock option grants. The evidence showed that Mr. Perlegos circumvented the

Company's stock option plan requirements and granting procedures. The evidence indicated that Mr. Perlegos knew that stock option grants had to be approved by the Board and that the price for stock options should be set as of the date on which the Board approved the grant.

o   There was evidence that, at least by 2002, Mr. Perlegos was informed about the accounting consequences of backdating stock options . . . .

o   Mr. Perlegos did not fully cooperate in the investigation . . . .

o   Because of his involvement in the intentional backdating of stock options, the Audit Committee believed the evidence raised serious concerns regarding George Perlegos's management integrity with respect to the stock option process.

-- Mike Ross

o   Mike Ross was the Company's General Counsel from 1989 until August 2006. Based on evidence from the stock option investigation, the Audit Committee concluded that Mr. Ross handled communications with the Board of Directors regarding stock options and, during certain periods, supervised Atmel's stock administration department.

o   The Audit Committee also concluded that Mr. Ross was aware of, and participated in the backdating of stock options. The evidence included documents that showed that Mr. Ross directed numerous changes to stock option lists many months after the lists were approved by the Board of Directors . . . . Stock administration employees stated, and records showed, that Mr. Ross directed stock administration employees to issue backdated stock option grants to employees and directed or permitted other actions to be taken contrary to the terms of Atmel's stock option plans. The evidence from the investigation showed that Mr. Ross circumvented the Company's stock option plan requirements and granting procedures. The evidence indicated that Mr. Ross knew that the stock option grants must be approved by the Board and that the price for stock options should be set as of the date on which the Board approved the grant.

o   There was evidence that, at least by 2002, Mr. Ross was informed about accounting consequences of backdating stock options . . . .

o   There also was evidence that Mr. Ross personally benefited from the receipt of backdated stock options that were not approved by the Board of Directors, and that he backdated his exercises of his own stock options to dates on which the Company's stock price was at a period low, thereby potentially reducing his tax liability.

o   Mr. Ross did not cooperate in the investigation.

o   Because of his involvement in the intentional backdating of stock options and his other conduct, the Audit Committee believed the evidence indicated that Mike Ross lacked management integrity with respect to the stock option process.

•   The evidence did not raise similar concerns about other former officers.

As a result of the measurement date errors identified in the Audit Committee's investigation, the Company has determined that material stock-based compensation adjustments are required for the period beginning in 1993 and continuing through January 2004. The Company estimates that aggregate non-cash stock-based compensation expenses for the period from 1993 through 2005, excluding related income tax adjustments, will be approximately $125 million. Any such compensation expenses would have the effect of decreasing net income or increasing net loss and decreasing retained earnings or increasing accumulated deficit as reported in the Company's historical financial statements.

The financial information in this release is preliminary and is subject to changes that might result from management's review of the findings of the Audit Committee, and audit by the Company's independent registered public accounting firm, but it provides management's best estimates based on available information.

(emphasis added).

199.    In sum, the Audit Committee admitted that "93 of the 112 stock option grants during the period January 1, 1997 through August 3, 2006" were backdated.  In addition, because of the measurement date errors, Company expects to adjust for the material compensation expenses for the period from 1993 to 2004 and thus to restate its historical financial statements to account for the additional stock-based compensation expenses.

200.    The Company found that George Perlegos and Ross were primarily responsible for the backdating of Atmel stock option grants.  Atmel admits to backdating option grants from 1997 to 2006 when directors Thomas and Fougere were on the Board and had the responsibility as Compensation Committee members to grant stock options – a responsibility that was not delegable under the Company's stock option plans.  Remarkably, Thomas and Fougere are also members of the Audit Committee, which was responsible for the oversight of the internal investigation and in turn are actually investigating themselves.  Although defendants Thomas and Fougere may want to divert the blame and point the finger at George Perlegos and Ross as solely responsible, directors Thomas and Fougere are also accountable for participating in the backdating scheme.  As such, any claim that defendants Thomas and Fougere did nothing wrong must be disregarded.

201.    On May 1, 2007, the Company announced that "[a]s a result of the measurement date errors identified in the Audit Committee's investigation, the Company has determined that material stock-based compensation adjustments are required for measurement date errors in the period beginning in 1993 and continuing through January 2004. The Company estimates that aggregate non-cash stock-based compensation expenses for the period from 1993 through 2005, excluding related income tax adjustments, will be approximately $125 million."

202.    On June 8, 2007, the Company filed its fiscal 2006 financial statements, stating that "[u]pon completion of that investigation, the Company recorded additional aggregate non-cash

stock-based compensation expenses for the period from 1993 through 2005, excluding payroll and related income tax adjustments, of approximately *$116 million*." (emphasis added).

### General Corporate Governance Problems at Atmel

203.    In addition to the backdating scandal, Atmel has recently suffered additional corporate governance issues.  In July 2005, Atmel discovered that certain executives had used millions of dollars of Company money for their own personal airline travel.  After an eight-month investigation into the misuse of corporate travel funds, the special independent committee of Atmel's board discovered abuses by executives, some in the highest ranks of management.

204.    Specifically, the committee discovered that defendant George Perlegos had obtained dozens of airline tickets for himself and members of his family from Atmel's travel office at a cost to Atmel of approximately $170,000 and then masked personal travel expenses of family members as reimbursable Atmel business expenses by submitting false reimbursement expenses to Atmel's accounting department.  Similarly, defendant Gust Perlegos also obtained dozens of airline tickets for himself and family members at a cost to the Company of approximately $60,000.

205.    On August 6, 2006, directors Fougere, Thomas, Kim, David Sugishita ("Sugishita") and Steven Laub ("Laub") elected Sugishita as Chairman and canceled the stockholders' meeting defendant George Perlegos had called for the day before, which had sought their removal.  Under claims of misuse of corporate travel funds, the Board then terminated both George Perlegos and Gust Perlegos, as well as two other executives involved in the travel scandal.

206.    Subsequently, George Perlegos and Gust Perlegos then filed suit against the Company in Delaware challenging these actions.  In February 2007, the Court of Chancery of the State of Delaware rejected their claims that they were improperly terminated for cause, stating "the record refutes any contention of [George Perlegos and Gust Perlegos] that they are innocent of material wrongdoing."

207.    While the Company has indicated that the travel scandal is unrelated to the option grant backdating problems, according to an August 11, 2006 *New York Times* article entitled "Atmel's Mess: You're Fired. No, You Are," the Company asked questions of George Perlegos and Gust Perlegos in the travel expense investigation regarding options granted in 1997, 1998 and

1   2001. Moreover, an analyst at Wedbush Morgan Securities noted, the "alleged misuse of corporate

2   travel funds, along with the firm's investigation into options backdating, could be representative of

3   a larger, systemic problem with general corporate governance issues at Atmel."

4        208.    In fact, despite that, in Atmel's 2005 annual report, management reported there were

5   no    material    weaknesses    in    internal    controls    and    the    Company's    auditors    at

6   PricewaterhouseCoopers LLP agreed, the investigation of travel spending underway at that time

7   resulted in the finding that executives deserved to be fired for lack of controls.

8        209.    On August 25, 2006 defendant George Perlegos submitted a letter to Atmel

9   proclaiming his resignation from the Board as Chairman, which Atmel included in a filing with the

10   SEC on August 28, 2006. George Perlegos stated that he would not be attending any future board

11   meetings "[b]ased on the Independent Board's actions to form special committees for so many of

12   the important issues to be decided amongst them without the full Board's involvement." On

13   August 28, 2006, the Company announced that it had received a notice from NASDAQ that it was

14   not in compliance with the director independence listing requirement but had come back into

15   compliance with the resignation of George Perlegos.

16       210.    In a May 3, 2007 Letter to Shareholders, the Company conceded that Atmel under

17   George Perlegos' direction had "limited control systems" and "poor execution." Under George

18   Perlegos, the organizational structure had "gaps in management team," "misaligned reward

19   structure," and "lack of accountability." The corporate governance structure was described as

20   "material improprieties at the highest level of the organization," "misuse of corporate funds for

21   personal gain," "widespread and intentional back-dating – directed by the CEO and general counsel

22   – leading to delays in financial reporting."

23       211.    Since their resignations as President and Chief Executive Officer and as Executive

24   Vice President, Office of the President, respectively, George Perlegos and Gust Perlegos have

25   attempted to replace the Board, which, as recently as May 18, 2007, the current Board is still trying

26   to sort out.

27

28

**INDIVIDUAL DEFENDANTS' CONDUCT CAUSED HARM TO THE COMPANY**

212.    As a result of the backdating and other manipulation of options issued to Defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann, they have been unjustly enriched in the amount of millions of dollars at the expense of the Company. The Company has received and will receive less money from these defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

### Restatement of Atmel's Financial Statements

213.    The practice of backdating stock options not only lined the pockets of the Company's executives at the direct expense of the Company but also resulted in the overstatement of the Company's net income. This is because options priced below the stock's fair market value when they were awarded brought the recipient an instant paper gain that must be accounted for as additional compensation and treated as an expense to the Company. Indeed, the Company restated its historical financial results to account for additional stock-based compensation totaling $116 million.

214.    On October 30, 2006, the Audit Committee announced that it had preliminarily determined, after discussion with Atmel's outside auditors, PricewaterhouseCoopers LLP, that all financial statements issued by the Company, relating to fiscal years 2003 through 2005, as well as those prior to 2003 and for the first quarter of fiscal year 2006, should not be relied upon pending completion of the investigation and resulting restatement. The Audit Committee also preliminarily concluded that, pursuant to the requirements of APB 25, different accounting measurement dates for the purpose of computing compensation costs for certain stock option grants should have been used.

215.    Atmel also admitted that the additional non-cash stock-based compensation expense under the revised calculations will have the effect of decreasing reported net income or increasing reported net loss, and increasing the reported accumulated deficit contained in the Company's historical financial statements.

216.    On June 8, 2007, Atmel filed its financial results the fiscal year ended December 31, 2006, which included restatements of the following previously filed financial statements and data:

(1) [Atmel's] consolidated financial statements as of December 31, 2005 and for our fiscal years ended December 31, 2005 and 2004; (2) [Atmel's] selected financial data as of and for our fiscal years ended December 31, 2005, 2004, 2003 and 2002 located in Item 6 of this Form 10-K, (3) [Atmel's] management's discussion and analysis of financial condition and results of operations as of and for our fiscal years ended December 31, 2005 and 2004 contained in Item 7 of this Form 10-K, and (4) [Atmel's] unaudited quarterly financial information for the first quarter in our fiscal year ended December 31, 2006, and for all quarters in our fiscal year ended December 31, 2005 located at the end of Item 8 of this Form 10-K. The restatements result from an independent stock option investigation conducted by the Audit Committee of the Board of Directors."

217.    The Form 10-K filed on June 8, 2007 further stated that "[f]inancial information included in the reports on Form 10-K, Form 10-Q and Form 8-K filed by us prior to August 10, 2006, and all earnings press releases and similar communications issued by us prior to August 10, 2006, should not be relied upon and are superseded in their entirety by this Report and Quarterly Reports on Form 10-Q and Current Reports on Form 8-K filed by us with the Securities and Exchange Commission on or after August 10, 2006."

218.    The 2006 annual report further stated:

As a result of the measurement date and other errors identified in the Audit Committee's investigation and subsequent management review, the Company recorded aggregate non-cash stock-based compensation expenses for the period from 1993 through 2005 of approximately $116 million, plus associated payroll tax expense of $2 million, less related income tax benefit of $12 million, for total stock-based compensation expense, net of income tax of $106 million. As part of the restatement of the consolidated financial statements, the Company also recorded additional non-cash adjustments that were previously identified and considered to be immaterial. The cumulative after-tax benefit from the recording of these adjustments was $11 million for the period from 1993 through 2005. These adjustments related primarily to the timing of revenue recognition and related reserves, recognition of grant benefits, accruals for litigation and other expenses, reversal of income tax expense related to unrealized foreign exchange translation gains, and asset impairment charges. The total impact of all restatement adjustments resulted in net cumulative expenses through 2005 of $94 million. These expenses had the effect of decreasing net income or increasing net loss and decreasing retained earnings or increasing accumulated deficit as previously reported in the Company's historical financial statements.

219.    In addition to the serious and adverse tax consequences, which resulted from the Company's failure to record additional non-cash stock-based compensation, Atmel faces millions in costs associated with the Audit Committee's review and the related restatements.    In the

1    Company's August 1, 2007 conference call with analysts, Atmel admitted that expenses relating to

2    special meetings by the Board of Directors and special investigations into backdating and other

3    independent investigation had reached *$15 million* in the second quarter of 2007. Atmel also will

4    likely admit to material weakness in its financial controls resulting in a qualified opinion from its

5    outside auditor.

6                    **Dissemination of False and Misleading Financial Statements**

7           220.   As known to defendants George Perlegos, Gust Perlegos, Ross and Chellam and

8    Compensation Committee members Hall, Thomas, Fougere and Kim, their secret option

9    backdating scheme caused each of Atmel's Forms 10-K and Forms 10-Q for the relevant period to

10   materially understate Atmel's compensation expense and materially overstate the Company's net

11   income or materially understate its net loss, because these defendants failed to expense the in-the-

12   money portion of Atmel's stock option grants during the relevant period as required by APB 25.

13          221.   Particularly, defendants Hall, Thomas, Fougere and Kim also served on the Audit

14   Committee and knew the effects their backdating practices had on Atmel's financial statements.

15   Furthermore, Chellam was the Company's CFO and knowingly made false statements in Atmel's

16   financial reports. They knew that, as a result of their misconduct, the compensation expenses were

17   understated and thus their net income was overstated.

18          222.   As a result of the improper backdating of stock options, the Company, with the

19   knowledge, approval and participation of defendants George Perlegos, Gust Perlegos, Ross and

20   Chellam and Compensation Committee members Hall, Thomas, Fougere and Kim:

21          a.     violated the terms of the Plans by granting stock options with exercise prices
                   less than the fair market value of the stock on the actual date of grant;
22

23          b.     violated APB 25 by failing to recognize compensation expenses incurred
                   when the improperly backdated options were granted;

24          c.     violated Section 162(m) by taking tax deductions based on stock option
                   grants that were not payable solely on account of the attainment of one or
25                 more performance goals and violated the terms of the Company's
                   shareholder-approved stock option plans; and
26

27          d.     produced and disseminated false financial statements to Atmel shareholders
                   and the market that improperly recorded and accounted for the backdated
28                 option grants, and thereby understated compensation expenses and
                   overstated net income.

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                    59

223. The Company, with the knowledge, approval and participation of defendants George Perlegos, Gust Perlegos, Ross and Chellam and Compensation Committee members Hall, Thomas, Fougere and Kim, disseminated its false financial statements in, inter alia, the following Form 10-K filings:

a.   Form 10-K for the fiscal year ended December 31, 1996, filed with the SEC on March 27, 1997 and signed by defendants George Perlegos, Chellam, Hall and Gust Perlegos;

b.   Form 10-K405 for the fiscal year ended December 31, 1997, filed with the SEC on March 30, 1998 and signed by defendants George Perlegos, Chellam, Hall, Gust Perlegos, Thomas and Wu;

c.   Form 10-K405/A for the fiscal year ended December 31, 1997, filed with the SEC on November 9, 1998 and signed by defendants George Perlegos, Chellam, Hall, Gust Perlegos, Thomas and Wu;

d.   Form 10-K405/A for the fiscal year ended December 31, 1997, filed with the SEC on January 20, 1999 and signed by defendants George Perlegos, Chellam, Hall, Gust Perlegos, Thomas and Wu;

e.   Form 10-K405/A for the fiscal year ended December 31, 1997, filed with the SEC on March 30, 1999 and signed by defendants George Perlegos, Chellam, Hall, Gust Perlegos, Thomas and Wu;

f.   Form 10-K405 for the fiscal year ended December 31, 1998, filed with the SEC on March 23, 1999 and signed by defendants George Perlegos, Colvin, Hall, Gust Perlegos, Thomas and Wu;

g.   Form 10-K405/A for the fiscal year ended December 31, 1998, filed with the SEC on July 21, 1999 and signed by defendants George Perlegos, Colvin, Hall, Gust Perlegos, Thomas and Wu;

h.   Form 10-K405 for the fiscal year ended December 31, 1999, filed with the SEC on March 15, 2000 and signed by defendants George Perlegos, Colvin, Hall, Gust Perlegos, Thomas and Wu;

i.   Form 10-K405 for the fiscal year ended December 31, 2000, filed with the SEC on March 14, 2001 and signed by defendants George Perlegos, Colvin, Hall, Gust Perlegos, Thomas, Wu and Fougere;

j.   Form 10-K405 for the fiscal year ended December 31, 2001, filed with the SEC on March 18, 2002 and signed by defendants George Perlegos, Colvin, Hall, Gust Perlegos, Thomas, Wu and Fougere;

k.   Form 10-K for the fiscal year ended December 31, 2002, filed with the SEC on March 24, 2003 and signed by defendants George Perlegos, Hall, Gust Perlegos, Thomas, Wu, Fougere and Kim;

l.   Form 10-K for the fiscal year ended December 31, 2003, filed with the SEC on March 15, 2004 and signed by defendants George Perlegos, Barton, Gust Perlegos, Wu, Thomas, Hall, Fougere and Kim;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                60

m. Form 10-K for the fiscal year ended December 31, 2004, filed with the SEC on March 25, 2005 and signed by defendants George Perlegos, Barton, Gust Perlegos, Wu, Thomas, Hall, Fougere and Kim; and

n. Form 10-K for the fiscal year ended December 31, 2005, filed with the SEC on March 16, 2006 and signed by defendants George Perlegos, Gust Perlegos, Wu, Thomas, Fougere and Kim.

224. Furthermore, Atmel's executives, including defendants Gust Perlegos, Wu, Chellam Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and George Perlegos, were overpaid improper cash bonuses based on the foregoing false and misleading financial information that should be repaid to the Company.

The 1996 Form 10-K

225. On or about March 27, 1997, Atmel filed its 1996 Report on Form 10-K with the SEC. Defendants George Perlegos, Gust Perlegos, Chellam, Hall and Thomas approved the Form 10-K that included Atmel's 1996 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As stated above, Audit Committee and Compensation Committee members Thomas and Hall, with the knowledge and participation of co-founders George Perlegos and Gust Perlegos and CFO Chellam, backdated 1994-1996 stock option grants to dates when Atmel's stock price was lower, thereby benefiting the option recipients (Chellam, Peckham, Turner, Gust Perlegos, Wu, and Schumann who received backdated grants in 1994 or 1995) to the detriment of the Company. As a result, defendants George Perlegos, Gust Perlegos, Chellam, Hall and Thomas knew that Atmel's compensation expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year 1996 filed on March 27, 1997.

226. In addition, Defendants George Perlegos, Gust Perlegos, Chellam and Hall made the following misrepresentations about Atmel's stock option plans in the 1996 Report on Form 10-K:

The Company's 1986 Incentive Stock Option Plan (1986 Plan) expired in April 1996. On April 24, 1996, the shareholders approved the Company's 1996 Stock Plan (1996 Plan) and the reservation of 4,000 shares of Common Stock for issuance thereunder. Under the Company's 1996 Plan, the Company may issue common stock directly or grant options to purchase common stock to employees, consultants and directors of the Company. Options, which generally vest over four years, are granted at fair market value on the date of the grant and generally expire five to ten years from that date. At December 31, 1996, the Company had 8,449 shares of common stock reserved for the issuance pursuant to the exercise

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

61

of stock options, of which 2,463 shares (2,045 shares at December 31, 1995) were exercisable.

227.    As detailed above, this statement was knowingly false and misleading because stock options were not "granted at fair market value on the date of grant" but in fact had an exercise price less than the stock price on the actual date of grant. Defendants George Perlegos, Gust Perlegos, Chellam, and Hall knew the statement was false and misleading when they made the representation in the 1996 Form 10-K because they were involved in the backdating of grants from 1994 to 1996.

228.    The 1996 Form 10-K was signed by defendants George Perlegos, Chellam, Hall and Gust Perlegos, and because of their involvement in the backdating scheme, George Perlegos, Gust Perlegos, Chellam, Thomas and Hall knowingly approved the filing of the false Form 10-K for fiscal year 1996.

The 1997 Form 10-K405

229.    On or about May 30, 1998, Atmel filed its 1997 Report on Form 10-K405 with the SEC. Again, defendants George Perlegos, Gust Perlegos, Chellam, Hall and Thomas approved and signed the Form 10-K405 that included Atmel's 1997 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As stated above, Audit Committee and Compensation Committee members Thomas and Hall, with the knowledge and participation of co-founders George Perlegos and Gust Perlegos, general counsel Ross and CFO Chellam, knowingly backdated stock option grants to April 11, 1997 when Atmel's stock price was lower than the actual grant date and thus was more favorable for the option recipients (Gust Perlegos, Wu, Chellam and Peckham) and detrimental to the Company. As a result, defendants George Perlegos, Gust Perlegos, Chellam, Hall and Thomas knew that Atmel's compensation expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K405 for fiscal year 1997 filed on May 30, 1998.

230.    In addition, Defendants George Perlegos, Gust Perlegos, Chellam, Thomas and Hall made the following misrepresentations about Atmel's stock option plans in the 1997 Report on Form 10-K405:

The Company has two stock option plans--the 1986 Incentive Stock Option Plan (1986 Plan) and the 1996 Stock Plan (1996 Plan). The 1986 Plan expired in April 1996. The 1996 Plan, which has reserved 4,000 shares of Common Stock for issuance thereunder, was approved by the shareholders on April 26, 1996. Under the Company's 1996 Plan, the Company may issue common stock directly or grant options to purchase common stock to employees, consultants and directors of the Company. Options, which generally vest over four years, are granted at fair market value on the date of the grant and generally expire ten years from that date.

231.    As detailed above, this statement was knowingly false and misleading because the stock options purportedly dated April 11, 1997 were not "granted at fair market value on the date of grant" but in fact had an exercise price less than the stock price on the actual date of grant. Defendants George Perlegos, Gust Perlegos, Chellam, Ross, Thomas and Hall knew the statement was false and misleading when they made the representation in the 1997 Form 10-K405 because they were involved in the backdating of the April 11, 1997 stock option grants.

232.    The 1997 Form 10-K405 was signed by defendants George Perlegos, Chellam, Hall, Gust Perlegos, Thomas and Wu and because of their involvement in the backdating scheme, George Perlegos, Gust Perlegos, Thomas and Hall knowingly approved the filing of the false Form 10-K405 for fiscal year 1997.

The 1997 Forms 10-K405/A

233.    On or about November 9, 1998, January 20, 1999 and March 30, 1999, Atmel filed amended 1997 Reports on Forms 10-K405/A with the SEC where Defendants George Perlegos, Gust Perlegos, Chellam, Hall and Thomas knowingly made the same false and misleading statements as those in the initial 1997 Form 10-K405. Again, defendants George Perlegos, Gust Perlegos, Chellam, Hall and Thomas approved and signed the Forms 10-K405/A that included Atmel's 1997 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As stated above, Audit Committee and Compensation Committee members Thomas and Hall, with the knowledge and participation of defendants George Perlegos, Gust Perlegos, Ross and Chellam, knowingly backdated stock option grants to April 11, 1997 when Atmel's stock price was lower than the actual grant date and thus was more favorable for the option recipients (Gust Perlegos, Wu, Chellam and Peckham) and detrimental to the Company. As a result, defendants George

1  Perlegos, Gust Perlegos, Ross, Chellam, Hall and Thomas knew that Atmel's compensation

2  expense was understated and its net earnings were overstated and thus knowingly approved the

3  false Forms 10-K405/A for fiscal year 1997 filed on November 9, 1998, January 20, 1999 and

4  March 30, 1999.

5        234.    In addition, Defendants George Perlegos, Gust Perlegos, Chellam, Thomas and Hall

6  made the same misrepresentation about Atmel's stock option plans in the Amended 1997 Reports

7  on Forms 10-K405/A as they did in the initial 1997 Annual Report:

8            The Company has two stock option plans--the 1986 Incentive Stock Option Plan
             (1986 Plan) and the 1996 Stock Plan (1996 Plan). The 1986 Plan expired in April
9            1996. The 1996 Plan, which has reserved 4,000 shares of Common Stock for
             issuance thereunder, was approved by the shareholders on April 26, 1996. Under
10           the Company's 1996 Plan, the Company may issue common stock directly or
             grant options to purchase common stock to employees, consultants and directors
11           of the Company. Options, which generally vest over four years, are granted at fair
             market value on the date of the grant and generally expire ten years from that
12           date.

13        235.    As detailed above, this statement was knowingly false and misleading because the

14  stock options purportedly dated April 11, 1997 were not "granted at fair market value on the date

15  of grant" but in fact had an exercise price less than the stock price on the actual date of grant.

16  Defendants George Perlegos, Gust Perlegos, Chellam, Thomas and Hall knew the statement was

17  false and misleading when they made the representation in the 1997 Forms 10-K405/A because

18  they were involved in the backdating of the April 11, 1997 stock option grants.

19        236.    The 1997 Forms 10-K405 were signed by defendants George Perlegos, Chellam,

20  Hall, Gust Perlegos, Thomas and Wu, and because of their involvement in the backdating scheme,

21  George Perlegos, Gust Perlegos, Chellam, Thomas and Hall knowingly approved the filing of the

22  false Forms 10-K405/A for fiscal year 1997.

23  The 1998 Form 10-K405

24        237.    On or about May 23, 1999, Atmel filed its 1998 Report on Form 10-K405 with the

25  SEC.  Defendants George Perlegos, Gust Perlegos, Hall and Thomas approved and signed the

26  Form 10-K405 that included Atmel's 1998 financial statements, which they knew were materially

27  false and misleading and presented in violation of GAAP, due to improper accounting for the

28  backdated stock options.  As stated above, as Audit Committee and Compensation Committee

members, defendants Thomas and Hall, with the knowledge and participation of co-founders George Perlegos and Gust Perlegos, approved stock options grants dated October 9, 1998 when Atmel's stock price was lower than the actual grant date with knowledge that October 9, 1998 was not the date Compensation Committee members Thomas and Hall approved the grants.  These defendants granted these improperly priced and dated options for the benefit of defendants Pruniaux, Schumann and Turner to the detriment of the Company. As a result, defendants George Perlegos, Gust Perlegos, Hall and Thomas knew that Atmel's compensation expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K405 for fiscal year 1998 filed on May 23, 1999.

238.    In addition, Defendants George Perlegos, Gust Perlegos, Thomas and Hall made the following misrepresentations about Atmel's stock option plans in the 1998 Report on Form 10-K405:

> The Company has two stock option plans--the 1986 Incentive Stock Option Plan (1986 Plan) and the 1996 Stock Plan (1996 Plan). The 1986 Plan expired in April 1996. The 1996 Plan, which has reserved 4,000 shares of Common Stock for issuance thereunder, was approved by the shareholders on April 26, 1996. Under the Company's 1996 Plan, the Company may issue common stock directly or grant options to purchase common stock to employees, consultants and directors of the Company. Options, which generally vest over four years, are granted at fair market value on the date of the grant and generally expire ten years from that date.

239.    As detailed above, this statement was knowingly false and misleading because the stock options purportedly dated October 9, 1998 were not "granted at fair market value on the date of grant" but in fact had an exercise price less than the stock price on the actual date of grant. Defendants George Perlegos, Gust Perlegos, Thomas and Hall knew the statement was false and misleading when they made the representation in the 1998 Form 10-K405 because they were involved in the backdating of the October 9, 1998 stock option grants, as detailed above.

240.    The 1998 Form 10-K405 was signed by defendants George Perlegos, Colvin, Hall, Gust Perlegos, Thomas and Wu and because of their involvement in the backdating scheme, George Perlegos, Gust Perlegos, Thomas and Hall knowingly approved the filing of the false Form 10-K405 for fiscal year 1998.

1

<u>The 1998 Forms 10-K405/A</u>

2          241.    On or about July 21, 1999, Atmel filed amended 1998 Reports on a Form 10-

3    K405/A with the SEC where Defendants George Perlegos, Gust Perlegos, Hall and Thomas

4    knowingly made the same false and misleading statements as those in the initial 1998 Form 10-

5    K405. Again, defendants George Perlegos, Gust Perlegos, Hall and Thomas approved and signed

6    the Form 10-K405/A that included Atmel's 1998 financial statements, which they knew were

7    materially false and misleading and presented in violation of GAAP, due to improper accounting

8    for the backdated stock options. As stated above, Audit Committee and Compensation Committee

9    members Thomas and Hall, with the knowledge and participation of defendants George Perlegos

10   and Gust Perlegos, knowingly backdated stock option grants to October 9, 1998 when Atmel's

11   stock price was lower than the actual grant date and thus was more favorable for the option

12   recipients (Pruniaux, Schumann and Turner) and detrimental to the Company.  As a result,

13   defendants George Perlegos, Gust Perlegos, Hall and Thomas knew that Atmel's compensation

14   expense was understated and its net earnings were overstated and thus knowingly approved the

15   false Form 10-K405 for fiscal year 1998 filed on July 21, 1999.

16          242.    In addition, Defendants George Perlegos, Gust Perlegos, Thomas and Hall made the

17   same misrepresentation about Atmel's stock option plans in the Amended 1998 Report on Form

18   10-K405/A as they did in the initial 1998 Annual Report:

19              The Company has two stock option plans -- the 1986 Incentive Stock Option Plan
                (1986 Plan) and the 1996 Stock Option Plan (1996 Plan). The 1986 Plan expired
20              in April 1996. The 1996 Plan, which has reserved 4,000 shares of Common Stock
                for issuance thereunder, was approved by the shareholders on April 26, 1996.
21              Under the Company's 1996 Plan, the Company may issue common stock directly
                or grant options to purchase common stock to employees, consultants and
22              directors of the Company. Options, which generally vest over four years, are
                granted at fair market value on the date of the grant and generally expire ten years
23              from that date.

24          243.    As detailed above, this statement was knowingly false and misleading because the

25   stock options purportedly dated October 9, 1998 were not "granted at fair market value on the date

26   of grant" but in fact had an exercise price less than the stock price on the actual date of grant.

27   Defendants George Perlegos, Gust Perlegos, Thomas and Hall knew the statement was false and

28   misleading when they made the representation in the 1998 Form 10-K405/A because they were

1   involved in the backdating of the October 9, 1998 stock option grants to defendants Pruniaux,

2   Schumann and Turner.

3        244.    The 1997 Forms 10-K405 were signed by defendants George Perlegos, Colvin, Hall,

4   Gust Perlegos, Thomas and Wu, and because of their involvement in the backdating scheme,

5   George Perlegos, Gust Perlegos, Thomas and Hall knowingly approved the filing of the false Form

6   10-K405/A for fiscal year 1998.

7   The 1999 Form 10-K405

8        245.    On or about March 15, 2000, Atmel filed its 1999 Report on Form 10-K405 with the

9   SEC. Defendants George Perlegos, Gust Perlegos, Hall and Thomas approved and signed the

10  Form 10-K405 that included Atmel's 1999 financial statements, which they knew were materially

11  false and misleading and presented in violation of GAAP, due to improper accounting for the

12  backdated stock options.  As stated above, Audit Committee and Compensation Committee

13  members Thomas and Hall, with the knowledge and participation of defendants George Perlegos,

14  Gust Perlegos and Ross, knowingly backdated the February 12, 1999, June 11, 1999 and July 16,

15  1999 grants when they knew that they actually approved these grants on later dates and backdated

16  these grants to when Atmel's stock price was lower than the actual grant date.  Defendants George

17  Perlegos, Gust Perlegos, Hall and Thomas granted these improperly priced and dated options for

18  the benefit of defendants Colvin, Sisois, Katz and Turner, the recipients of the backdated stock

19  option grants, to the detriment of the Company.  As a result, defendants George Perlegos, Gust

20  Perlegos, Hall and Thomas knew that Atmel's compensation expense was understated and its net

21  earnings were overstated and thus knowingly approved the false Form 10-K405 for fiscal year

22  1999 filed on March 15, 2000.

23       246.    In addition, Defendants George Perlegos, Gust Perlegos, Thomas and Hall made the

24  following misrepresentations about Atmel's stock option plans in the 1999 Report on Form 10-

25  K405:

26       The Company has two stock option plans--the 1986 Incentive Stock Option Plan
         (1986 Plan) and the 1996 Stock Option Plan (1996 Plan). The 1986 Plan expired in
27       April 1996. The 1996 Plan, which has reserved 18 million shares of Common Stock
         for issuance thereunder, was approved by the stockholders on April 26, 1996. On
28       April 28, 1999 the stockholders approved increasing the number shares authorized

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                          67

under this plan by 10 million shares. Under the Company's 1996 Plan, the Company may issue common stock directly or grant options to purchase common stock to employees, consultants and directors of the Company. Options, which generally vest over four years, are granted at fair market value on the date of the grant and generally expire ten years from that date.

247.    As detailed above, this statement was knowingly false and misleading because the stock options purportedly dated February 12, 1999, June 11, 1999 and July 16, 1999 were not "granted at fair market value on the date of grant" but in fact had exercise prices less than the stock price on the actual grant dates. Defendants George Perlegos, Gust Perlegos, Ross, Thomas and Hall knew the statement was false and misleading when they made the representation in the 1999 Form 10-K405 because they were involved in the backdating of the February 12, 1999, June 11, 1999 and July 16, 1999 stock option grants, as detailed above.

248.    The 1999 Form 10-K405 was signed by defendants George Perlegos, Colvin, Hall, Gust Perlegos, Thomas and Wu and because of their involvement in the backdating scheme, George Perlegos, Gust Perlegos, Thomas and Hall knowingly approved the filing of the false Form 10-K405 for fiscal year 1999.

The 2000 Form 10-K405

249.    On or about March 14, 2001, Atmel filed its 2000 Report on Form 10-K405 with the SEC. Defendants George Perlegos, Gust Perlegos, Hall, Fougere and Thomas approved and signed the Form 10-K405 that included Atmel's 2000 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As stated above, Audit Committee and Compensation Committee members Thomas, Fougere and Hall, with the knowledge and participation of defendants George Perlegos and Gust Perlegos, knowingly backdated the stock option grants to November 17, 2000 when Atmel's stock price was lower than the actual grant date. Defendants George Perlegos, Gust Perlegos, Ross, Hall, Fougere and Thomas knew that the grant was approved at a later date. Furthermore, these defendants granted these improperly priced and dated options for the benefit of defendant Colvin to the detriment of the Company. As a result, defendants George Perlegos, Gust Perlegos, Hall, Fougere and Thomas knew that Atmel's compensation expense was understated and

1    its net earnings were overstated and thus knowingly approved the false Form 10-K405 for fiscal

2    year 2000 filed on March 14, 2001.

3            250.    In addition, Defendants George Perlegos, Gust Perlegos, Hall, Fougere and Thomas

4    made the following misrepresentations about Atmel's stock option plans in the 2000 Report on

5    Form 10-K405:

> Atmel has two stock option plans--the 1986 Incentive Stock Option Plan (1986
> Plan) and the 1996 Stock Option Plan (1996 Plan). The 1986 Plan expired in April
> 1996. The 1996 Plan, which has reserved 36 million shares of Common Stock for
> issuance thereunder, was approved by the stockholders on April 26, 1996.  Under
> Atmel's 1996 Plan, Atmel may issue common stock directly or grant options to
> purchase common stock to employees, consultants and directors of Atmel.  Options,
> which generally vest over four years, are granted at fair market value on the date of
> the grant and generally expire ten years from that date.

        251.    As detailed above, this statement was knowingly false and misleading because the

stock options purportedly dated November 17, 2000 were not "granted at fair market value on the

date of grant" but in fact had an exercise price less than the stock price on the actual date of grant.

Defendants George Perlegos, Gust Perlegos, Ross, Hall, Fougere and Thomas knew the statement

was false and misleading when they made the representation in the 2000 Form 10-K405 because

they were involved in the backdating of the November 17, 2000 stock option grant to Colvin, as

detailed above.

        252.    Furthermore, Defendants George Perlegos, Gust Perlegos, Hall, Thomas and

Fougere caused Atmel to falsely state in the 2000 Form 10-K405 that:

> Atmel accounts for stock-based compensation, including stock options granted and
> shares issued under the Employee Stock Purchase Plan, using the intrinsic value
> method prescribed in APB No. 25, "Accounting for Stock Issued to Employees,"
> and related interpretations. Compensation cost for stock options, if any, is
> recognized ratably over the vesting period. Atmel's policy is to grant options with
> an exercise price equal to the quoted market price of our stock on the grant date.

        253.    This statement was materially false and misleading because George Perlegos, Gust

Perlegos, Hall, Thomas and Fougere knowingly granted stock options at prices that were below fair

market value on the date of the grant and failed to account for the in-the-money options as required

by APB 25.

        254.    The 2000 Form 10-K405 was signed by defendants George Perlegos, Colvin, Hall,

Gust Perlegos, Thomas, Wu and Fougere and because of their involvement in the backdating

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                69

scheme, George Perlegos, Gust Perlegos, Thomas, Fougere and Hall knowingly approved the filing of the false Form 10-K405 for fiscal year 2000.

The 2001 Form 10-K405

255.    On or about March 18, 2002, Atmel filed its 2001 Report on Form 10-K405 with the SEC. Defendants George Perlegos, Gust Perlegos, Hall, Fougere and Thomas approved and signed the Form 10-K405 that included Atmel's 2001 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options.  As stated above, as Audit Committee and Compensation Committee members, Thomas, Fougere and Hall, with the knowledge and participation of defendants George Perlegos and Gust Perlegos, knowingly approved stock options dated September 17, 2001 when they knew that the grants were actually approved at a later date. Defendants George Perlegos, Gust Perlegos, Hall, Fougere and Thomas, with the knowledge and participation of Ross, backdated the grant to a date when Atmel's stock price was lower than the actual grant date and more favorable to recipient Colvin to the detriment of the Company.  As a result, defendants George Perlegos, Gust Perlegos, Hall, Fougere and Thomas knew that Atmel's compensation expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K405 for fiscal year 2001 filed on March 18, 2002.

256.    In addition, Defendants George Perlegos, Gust Perlegos, Hall, Fougere and Thomas made the following misrepresentations about Atmel's stock option plans in the 2001 Report on Form 10-K405:

> Atmel has two stock option plans-the 1986 Incentive Stock Option Plan (1986 Plan) and the 1996 Stock Option Plan (1996 Plan). The 1986 Plan expired in April 1996. The 1996 Plan, which has reserved 36 million shares of Common Stock for issuance thereunder, was approved by the stockholders on April 26, 1996. Under Atmel's 1996 Plan, Atmel may issue common stock directly or grant options to purchase common stock to employees, consultants and directors of Atmel. Options, which generally vest over four years, are granted at fair market value on the date of the grant and generally expire ten years from that date.

257.    As detailed above, this statement was knowingly false and misleading because the stock options purportedly dated September 17, 2001 were not "granted at fair market value on the date of grant" but in fact had an exercise price less than the stock price on the actual date of grant.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                    70

Defendants George Perlegos, Gust Perlegos, Ross, Hall, Fougere and Thomas knew the statement was false and misleading when they made the representation in the 2001 Form 10-K405 because they were involved in the backdating of the September 17, 2001 stock option grant to Colvin, as detailed above.

258.    Furthermore, Defendants George Perlegos, Gust Perlegos, Hall, Thomas and Fougere caused Atmel to falsely state in the 2001 Form 10-K405 that:

> Atmel accounts for stock-based compensation, including stock options granted and shares issued under the Employee Stock Purchase Plan, using the intrinsic value method prescribed in APB No. 25, "Accounting for Stock Issued to Employees," and related interpretations. Compensation cost for stock options, if any, is recognized ratably over the vesting period. Atmel's policy is to grant options with an exercise price equal to the quoted market price of our stock on the grant date.

259.    This statement was materially false and misleading because Perlegos, Gust Perlegos, Hall, Thomas and Fougere knowingly granted stock options at prices that were below fair market value on the date of the grant and failed to account for the in-the-money options as required by APB 25.

260.    The 2001 Form 10-K405 was signed by defendants George Perlegos, Colvin, Hall, Gust Perlegos, Thomas, Wu and Fougere, and because of their involvement in the backdating scheme, George Perlegos, Gust Perlegos, Thomas, Fougere and Hall knowingly approved the filing of the false Form 10-K405 for fiscal year 2001.

The 2002 Form 10-K

261.    On or about March 24, 2003, Atmel filed its 2002 Report on Form 10-K with the SEC. Defendants George Perlegos, Gust Perlegos, Hall, Fougere, Thomas and Kim approved and signed the Form 10-K that included Atmel's 2002 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As stated above, as Audit Committee and Compensation Committee members, defendants Thomas, Fougere, Hall and Kim, with the knowledge and participation of defendants George Perlegos, Gust Perlegos and Ross, knowingly approved stock options dated November 14, 2002 when they knew that the grants were actually approved at a later date. Defendants George Perlegos, Gust Perlegos, Hall, Fougere, Thomas and Kim backdated the

grant to a date when Atmel's stock price was lower than the actual grant date and more favorable to grantees Gust Perlegos, Wu, Colvin and Sisois to the detriment of the Company.  As a result, defendants George Perlegos, Gust Perlegos, Ross, Hall, Fougere, Thomas and Kim knew that Atmel's compensation expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year 2002 filed on March 24, 2003.

262.    In addition, Defendants George Perlegos, Gust Perlegos, Hall, Fougere, Thomas and Kim made the following misrepresentations about Atmel's stock option plans in the 2002 Report on Form 10-K:

> Atmel has two stock option plans—the 1986 Incentive Stock Option Plan (1986 Plan) and the 1996 Stock Option Plan (1996 Plan). The 1986 Plan expired in April 1996. The 1996 Plan, which has reserved 36,000 shares of Common Stock for issuance thereunder, was approved by the stockholders on April 26, 1996. Under Atmel's 1996 Plan, Atmel may issue common stock directly or grant options to purchase common stock to employees, consultants and directors of Atmel. Options, which generally vest over four years, are granted at fair market value on the date of the grant and generally expire ten years from that date.

263.    As detailed above, this statement was knowingly false and misleading because the stock options purportedly dated November 14, 2002 were not "granted at fair market value on the date of grant" but in fact had an exercise price less than the stock price on the actual date of grant. Defendants George Perlegos, Gust Perlegos, Hall, Fougere, Thomas and Kim knew the statement was false and misleading when they made the representation in the 2002 Form 10-K because they were involved in the backdating of the November 14, 2002 stock option grants, as detailed above.

264.    Furthermore, Defendants George Perlegos, Gust Perlegos, Hall, Thomas, Fougere and Kim caused Atmel to falsely state in the 2002 Form 10-K that:

> Atmel accounts for stock-based compensation, including stock options granted and shares issued under the Employee Stock Purchase Plan, using the intrinsic value method prescribed in APB No. 25, "Accounting for Stock Issued to Employees," and related interpretations. Compensation cost for stock options, if any, is recognized ratably over the vesting period. Atmel's policy is to grant options with an exercise price equal to the quoted market price of our stock on the grant date.

265.    This statement was materially false and misleading because Perlegos, Gust Perlegos, Hall, Thomas, Fougere and Kim knowingly granted stock options at prices that were below fair market value on the date of the grant and failed to account for the in-the-money options as required by APB 25.

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

72

266.    The 2002 Form 10-K was signed by defendants George Perlegos, Colvin, Hall, Gust Perlegos, Thomas, Wu, Fougere and Kim, and because of their involvement in the backdating scheme, George Perlegos, Gust Perlegos, Thomas, Fougere, Hall and Kim knowingly approved the filing of the false Form 10-K for fiscal year 2002.

267.    Furthermore, in the Company's 2002 Form 10-K, George Perlegos, Gust Perlegos, Thomas, Fougere, Hall and Kim represented that the Company's "disclosure controls and procedures" to ensure accurate financial reporting were found to be adequate.    However, such statements are false and misleading because defendants George Perlegos, Gust Perlegos, Thomas, Fougere, Hall and Kim were permitted to backdate stock option grants and to approve the filing of misleading financial statements.

**ITEM 14. CONTROLS AND PROCEDURES**

(a)  Evaluation of disclosure controls and procedures.

Within 90 days prior to the filing date of this Annual Report on Form 10-K (the "Evaluation Date"), we evaluated under the supervision of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures. Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures are effective to ensure that information we are required to disclose in reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms.

268.    Defendant George Perlegos signed a Certification of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which attested to the purported accuracy of the financial statements contained in the 2003 annual report, the effectiveness of the internal controls, and compliance with Section 13(a) of the Exchange Act, when he knew that this Certification was false and misleading.    Because of his involvement in the backdating scheme, Defendant George Perlegos knew that the 2002 financial results understated compensation expenses and overstated net income.    In the 2002 Certification, George Perlegos made the following false and misleading certification:

I, George Perlegos, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of Atmel Corporation on Form 10-K for the year ended December 31, 2002 (i) fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and (ii) that information contained in such Annual Report on Form 10-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                                73

1
2

K fairly presents in all material respects the financial condition and results of operations of Atmel Corporation.

The 2003 Form 10-K

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

269.    On or about March 15, 2004, Atmel filed its 2003 Report on Form 10-K with the SEC. Defendants George Perlegos, Gust Perlegos, Hall, Fougere, Thomas and Kim approved and signed the Form 10-K that included Atmel's 2003 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As stated above, as the Board administered the stock option plans in 2003, Defendants George Perlegos, Hall, Fougere, Thomas and Kim, with the knowledge and participation of defendant Ross and Gust Perlegos, knowingly approved stock options dated April 30, 2003 when they knew that the grants were actually approved at a later date. Defendants George Perlegos, Hall, Fougere, Thomas and Kim backdated the grant to a date when Atmel's stock price was lower than the actual grant date and more favorable to grantee Barton to the detriment of the Company. As a result, defendants George Perlegos, Gust Perlegos, Ross, Hall, Fougere and Thomas knew that Atmel's compensation expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year 2003 filed on March 15, 2004.

18
19

270.    In addition Defendants George Perlegos, Gust Perlegos, Hall, Fougere, Thomas and Kim made the following misrepresentations about Atmel's stock option plans in the 2003 Report on Form 10-K:

20
21
22
23
24

Atmel has two stock option plans — the 1986 Incentive Stock Option Plan (1986 Plan) and the 1996 Stock Option Plan (1996 Plan). The 1986 Plan expired in April 1996. The 1996 Plan, which has reserved 36,000 shares of Common Stock for issuance thereunder, was approved by the stockholders on April 26, 1996. Under Atmel's 1996 Plan, Atmel may issue common stock directly or grant options to purchase common stock to employees, consultants and directors of Atmel. Options, which generally vest over four years, are granted at fair market value on the date of the grant and generally expire ten years from that date.

25
26
27
28

271.    As detailed above, this statement was knowingly false and misleading because the stock options purportedly dated April 30, 2003 were not "granted at fair market value on the date of grant" but in fact had an exercise price less than the stock price on the actual date of grant. Defendants George Perlegos, Gust Perlegos, Ross, Hall, Fougere, Thomas and Kim knew the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                74

statement was false and misleading when they made the representation in the 2003 Form 10-K because they were involved in the backdating of the April 30, 2003 stock option grants, as detailed above.

272.    Furthermore, Defendants George Perlegos, Gust Perlegos, Hall, Thomas, Fougere and Kim caused Atmel to falsely state in the 2003 Form 10-K that:

> Atmel accounts for stock-based compensation, including stock options granted and shares issued under the Employee Stock Purchase Plan, using the intrinsic value method prescribed in APB No. 25, "Accounting for Stock Issued to Employees," and related interpretations. Compensation cost for stock options, if any, is recognized ratably over the vesting period. Atmel's policy is to grant options with an exercise price equal to the quoted market price of our stock on the grant date.

273.    This statement was materially false and misleading because Perlegos, Gust Perlegos, Hall, Thomas, Fougere and Kim knowingly granted stock options at prices that were below fair market value on the date of the grant and failed to account for the in-the-money options as required by APB 25.

274.    The 2003 Form 10-K was signed by defendants George Perlegos, Barton, Gust Perlegos, Wu, Thomas, Hall, Fougere and Kim, and because of their involvement in the backdating scheme, Defendants George Perlegos, Gust Perlegos, Hall, Fougere, Thomas and Kim knowingly approved the filing of the false Form 10-K for fiscal year 2003.

275.    Furthermore, in the Company's 2003 Form 10-K, George Perlegos, Gust Perlegos, Thomas, Fougere, Hall and Kim represented that the Company's "disclosure controls and procedures" to ensure accurate financial reporting were found to be adequate. However, such statements are false and misleading because defendants George Perlegos, Gust Perlegos, Thomas, Fougere, Hall and Kim were permitted to backdated stock option grants and to approve the filing of misleading financial statements.

### ITEM 9A. CONTROLS AND PROCEDURES

(a)    Evaluation of disclosure controls and procedures.

> As of the end of the period covered by this Annual Report on Form 10-K, we evaluated under the supervision of our Chief Executive Officer and our Chief Financial Officer, the effectiveness of our disclosure controls and procedures. Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures are effective to ensure that information we are required to disclose in reports that we file or submit

under the Securities Exchange Act of 1934 (i) is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and (ii) is accumulated and communicated to Atmel's management, including our Chief Executive Officer and our Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

276.    Defendant George Perlegos signed a Certification of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which attested to the purported accuracy of the financial statements contained in the 2003 annual report, the effectiveness of the internal controls, and compliance with Section 13(a) of the Exchange Act, when he knew that this Certification was false and misleading. Because of his involvement in the backdating scheme, Defendant George Perlegos knew that the 2003 financial results understated compensation expenses and overstated net income. In the 2003 Certification, George Perlegos made the following false and misleading certification:

1. I have reviewed this Annual Report on Form 10-K of Atmel Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)), for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

The 2004 Form 10-K

277.    On or about March 25, 2005, Atmel filed its 2004 Report on Form 10-K with the SEC. Defendants George Perlegos, Gust Perlegos, Hall, Fougere, Thomas and Kim approved and signed the Form 10-K that included Atmel's 2004 financial statements as well as the 2002-2003 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As stated above, as Compensation Committee members between 2002 and 2003, defendants George Perlegos, Thomas, Fougere, Hall and Kim, with the knowledge and participation of defendants Gust Perlegos and Ross, knowingly approved stock options granted from 2002 to 2003 when they knew that the grants were actually approved at a later date. Defendants George Perlegos, Gust Perlegos, Ross, Hall, Fougere, Thomas and Kim participated in the backdating of these grants to dates when Atmel's stock price was lower than the actual grant date. As a result, defendants George Perlegos, Gust Perlegos, Ross, Hall, Fougere, Thomas and Kim knew that Atmel's compensation expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year 2004 filed on March 25, 2005.

278.    In addition, Defendants George Perlegos, Gust Perlegos, Hall, Fougere, Thomas and Kim made the following misrepresentations about Atmel's stock option plans in the 2004 Report on Form 10-K:

Atmel has two stock option plans — the 1986 Plan and the 1996 Plan. The 1986 Plan expired in April 1996. The 1996 Plan, which has reserved 36,000 shares of Common Stock for issuance thereunder, was approved by the stockholders on April 26, 1996. Under Atmel's 1996 Plan, Atmel may issue common stock directly or grant options to purchase common stock to employees, consultants and directors of

Atmel. Options, which generally vest over four years, are granted at fair market value on the date of the grant and generally expire ten years from that date.

279.    As detailed above, this statement was knowingly false and misleading because Defendants George Perlegos, Gust Perlegos, Hall, Fougere, Thomas and Kim had knowingly granted stock options with exercise prices less then "fair market value on the date of grant" under the 1996 Plan.

280.    The 2004 Form 10-K was signed by defendants George Perlegos, Barton, Gust Perlegos, Wu, Thomas, Hall, Fougere and Kim, and because of their involvement in the backdating scheme, George Perlegos, Gust Perlegos, Thomas, Fougere, Hall and Kim knowingly approved the filing of the false Form 10-K for fiscal year 2004.

281.    Furthermore, in the Company's 2004 Form 10-K, George Perlegos, Gust Perlegos, Thomas, Fougere, Hall and Kim represented that the Company's "disclosure controls and procedures" to ensure accurate financial reporting were found to be adequate.    However, such statements are false and misleading because defendants George Perlegos, Gust Perlegos, Thomas, Fougere, Hall and Kim were permitted to backdated stock option grants and to approve the filing of misleading financial statements.

### ITEM 9A. CONTROLS AND PROCEDURES

Evaluation of Effectiveness of Disclosure Controls and Procedures

As of the end of the period covered by this Annual Report on Form 10-K, under the supervision of our Chief Executive Officer and our Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) and Rule 15(d)-15(e) under the Securities Exchange Act of 1934. Based on this evaluation, our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures were not effective as of the end of the period covered by this Annual Report on Form 10-K because of the material weaknesses discussed below.

Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934). Atmel's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with Generally Accepted Accounting Principles ("GAAP").

\* \* \*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                              78

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2004. This evaluation was based on the framework in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. In the course of this evaluation, we discovered two control deficiencies that constitute material weaknesses, as described below.

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. As of December 31, 2004, we have concluded that Atmel did not maintain effective controls over (i) the accounting for income taxes, including the determination of income taxes payable, deferred income tax assets and liabilities and the related income tax provision, and (ii) the accounting for inventory reserves and cost of revenues.

282.    Defendant George Perlegos signed a Certification of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which attested to the purported accuracy of the financial statements contained in the 2004 annual report, the effectiveness of the internal controls, and compliance with Section 13(a) of the Exchange Act, when he knew that this Certification was false and misleading. Because of his involvement in the backdating scheme, Defendant George Perlegos knew that the 2004 financial results understated compensation expenses and overstated net income. In the 2004 Certification, George Perlegos made the following false and misleading certification:

1. I have reviewed this Annual Report on Form 10-K of Atmel Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                      79

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

The 2005 Form 10-K

283.    On or about March 16, 2006, Atmel filed its 2005 Report on Form 10-K with the SEC. Defendants George Perlegos, Gust Perlegos, Hall, Fougere, Thomas and Kim approved and signed the Form 10-K that included Atmel's 2005 financial statements as well as the 2003 financial statements, which they knew were materially false and misleading and presented in violation of GAAP, due to improper accounting for the backdated stock options. As stated above, as the Board administered the stock option plans in 2003, Defendants George Perlegos, Hall, Fougere, Thomas and Kim, with the knowledge and participation of defendant Gust Perlegos and Ross, knowingly approved stock options granted in 2003 when they knew that the grants were actually approved at a later date. Defendants George Perlegos, Gust Perlegos, Ross, Hall, Fougere, Thomas and Kim participated in the backdating of these grants to dates when Atmel's stock price was lower than the

actual grant date. As a result, Defendants George Perlegos, Gust Perlegos, Ross, Hall, Fougere, Thomas and Kim knew that Atmel's compensation expense was understated and its net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year 2005 filed on March 16, 2006.

284. The 2005 Form 10-K was signed by defendants George Perlegos, Gust Perlegos, Wu, Thomas, Fougere and Kim and because of their involvement in the backdating scheme, Defendants George Perlegos, Gust Perlegos, Hall, Fougere, Thomas and Kim knowingly approved the filing of the false Form 10-K for fiscal year 2005.

285. Furthermore, in the Company's 2005 Form 10-K, Defendants George Perlegos, Gust Perlegos, Hall, Fougere, Thomas and Kim represented that the Company's "disclosure controls and procedures" to ensure accurate financial reporting were found to be adequate. However, such statements are false and misleading because Defendants George Perlegos, Gust Perlegos, Hall, Fougere, Thomas and Kim were permitted to backdated stock option grants and to approve the filing of misleading financial statements.

## ITEM 9A. CONTROLS AND PROCEDURES

### Evaluation of Effectiveness of Disclosure Controls and Procedures

As of the end of the period covered by this Annual Report on Form 10-K, under the supervision of our Chief Executive Officer and our Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures, as such terms are defined in Rule 13a-15(e) and Rule 15d-15(e) under the Securities and Exchange Act of 1934. Based on this evaluation our Chief Executive Officer and our Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Annual Report on Form 10-K to ensure that information we are required to disclose in reports that we file or submit under the Securities and Exchange Act of 1934 is accumulated and communicated to our management, including our principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure, and that such information is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms.

### Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934). Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*       *       *

Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2005. This evaluation was based on the framework in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on our assessment using the criteria in Internal Control — Integrated Framework, we concluded that our internal control over financial reporting was effective as of December 31, 2005.

286.    Defendant George Perlegos signed a Certification of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, which attested to the purported accuracy of the financial statements contained in the 2005 annual report, the effectiveness of the internal controls, and compliance with Section 13(a) of the Exchange Act, when he knew that the Certification was false and misleading. Because of his involvement in the backdating scheme, defendant George Perlegos knew that the 2005 financial results understated compensation expenses and overstated net income. In the 2005 Certification, George Perlegos made the following false and misleading certification:

1. I have reviewed this Annual Report on Form 10-K of Atmel Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                82

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

### The Individual Defendants' Concealment of Their Misconduct

287.    Defendants George Perlegos, Gust Perlegos, Hall, Thomas, Fougere and Kim, with the knowledge and participation of Ross, caused Atmel to issue false proxy statements in connection with the Company's annual shareholder meetings and periodically for special shareholder meetings during the relevant period. These defendants prepared and/or reviewed the 1994-2003 proxy statements before the statements were disseminated to shareholders and filed with the SEC. Moreover, George Perlegos, Gust Perlegos, Ross Hall, Thomas, Fougere and Kim knew that the proxies were materially false and misleading as they participated in the backdating of stock option grants from February 1994 to April 2003.

288.    Atmel shareholders routinely relied upon the false and misleading proxy statements issued by the Company and voted for the Company's stock option plans under which these defendants backdated stock option grants in order to benefit Company insiders at the expense of the Company and its shareholders.

289.    From 1994 to 2003, the Company, with the knowledge, approval and participation of Defendants George Perlegos, Gust Perlegos, Ross, Hall, Thomas, Fougere and Kim, for the

1    purpose and with the effect of concealing the improper option backdating, disseminated to

2    shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock

3    option grants to Defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton,

4    Turner, Pruniaux and Schumann, and falsely stated that options were granted to them at the fair

5    market value of the Company's common stock on the date of grant.

6    1994 Proxy Statement

7        290.    In Atmel's proxy statement filed with the SEC on March 22, 1995, Defendants

8    George Perlegos, Gust Perlegos, Chellam, Hall and Thomas falsely reported that stock options

9    granted to Chellam and Peckham were granted on February 4, 1994 when they were in fact granted

10   at a later date. Defendants George Perlegos, Gust Perlegos, Chellam, Hall and Thomas made the

11   following representations about Atmel's granting practices:

12       **REPORT OF THE COMPENSATION COMMITTEE**

13       The Compensation Committee of the Board of Directors generally reviews and
         approved the Company's executive compensation policies, including the base salary
14       levels and target incentives for executive officers of the Company at the beginning
         of each year, and approved the performance objectives of the Company's officers in
15       their areas of responsibility.  The Compensation Committee also administers the
         Company's incentive stock plans, including its 1986 Incentive Stock Option Plan
16       and the 1991 Employee Stock Purchase Plan. . . . Meetings of the Compensation
         Committee are also attended by George Perlegos, the Company's President and
17       Chief Executive Officer, and Kris Chellam, the Company's Chief Financial Officer,
         who provide background and market information and make recommendations to the
18       Compensation Committee on salary levels, officer performance objectives and
         corporate financial goals. . . .
19
20       291.    Further, the Compensation Committee (Hall and Thomas), made the following

21   representations about Atmel's stock option grants: "All options are granted at the current market

22   price of the Company's Common Stock on the date of grant . . . . During 1994, the Compensation

23   Committee granted options to purchase an aggregate of 136,000 shares of Common Stock to seven

24   officers, and such options were exercisable at a price of $18.31 per share."

25       292.    Each of the above statements concerning the value of the stock options on the date

26   of grant was knowingly false and misleading because the option grants to defendants Chellam,

27   Peckman and Turner purportedly on February 4, 1994 were backdated and were granted at less

28   than the current market price as reported by Compensation Committee members Hall and Thomas

and as prohibited by Atmel's stock option plans. Contrary to the above representations, none of the backdated options was ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

1995 Proxy Statement

293.    In Atmel's proxy statement filed with the SEC on March 19, 1996, Defendants George Perlegos, Gust Perlegos, Chellam, Hall and Thomas falsely reported that stock options granted to Gust Perlegos, Wu, Chellam and Peckham were granted on February 22, 1995, when they were in fact granted at a later date. Defendants George Perlegos, Gust Perlegos, Chellam, Hall and Thomas made the following representations about Atmel's granting practices:

**REPORT OF THE COMPENSATION COMMITTEE**

> The Compensation Committee of the Board of Directors generally reviews and approves the Company's executive compensation policies, including the base salary levels and target incentives for executive officers of the Company at the beginning of each year, and approves the performance objectives of the Company's officers in their areas of responsibility. The Compensation Committee also administers the Company's incentive stock plans, including its 1986 Incentive Stock Option Plan and the 1991 Employee Stock Purchase Plan. . . . Meetings of the Compensation Committee are also attended by George Perlegos, the Company's President and Chief Executive Officer, and Kris Chellam, the Company's Chief Financial Officer, who provide background and market information and make recommendations to the Compensation Committee on salary levels, officer performance objectives and corporate financial goals. . . .

294.    Further, the Compensation Committee (Hall and Thomas), made the following representations about Atmel's stock option grants: "All options are granted at the current market price of the Company's Common Stock on the date of grant . . . . During 1995, the Compensation Committee granted options to purchase an aggregate of 260,000 shares of Common Stock to six officers, and such options were exercisable at a price of $15.406 per share."

295.    Each of the above statements concerning the value of the stock options on the date of grant was knowingly false and misleading because the option grants to defendants Gust Perlegos, Wu, Chellam, Peckham and Shumann purportedly on February 22, 1995 were backdated and were granted at less than the current market price as reported by Compensation Committee members Hall and Thomas and as prohibited by Atmel's stock option plans. Contrary to the above

1  representations, none of the backdated options was ever approved by the shareholders, nor were

2  shareholders ever aware of this illicit compensation.

3  1997 Proxy Statement

4  296.   In Atmel's proxy statement filed with the SEC on March 19, 1998, Defendants

5  George Perlegos, Gust Perlegos, Chellam, Hall and Thomas falsely reported that stock options

6  granted to Gust Perlegos, Wu, Chellam and Peckham were granted on April 11, 1997 and that the

7  exercise prices of these options were equal to the "current market price of [the Company's]

8  common stock on the date of grant." Defendants George Perlegos, Gust Perlegos, Chellam, Hall

9  and Thomas knew the statements were false because they had actually issued the grants at a later

10  date after April 11, 1997. Defendants George Perlegos, Gust Perlegos, Chellam, Hall and Thomas

11  made the following representations about Atmel's granting practices and stock option plans:

12  **REPORT OF THE COMPENSATION COMMITTEE**

13  The Compensation Committee of the Board of Directors generally reviews and
approves the Company's executive compensation policies, including the base salary
14  levels and target incentives for executive officers of the Company at the beginning
of each year, and approves the performance objectives of the Company's officers in
15  their areas of responsibility. The Compensation Committee also administers the
Company's stock plans, including its 1996 Stock Plan and the 1991 Employee Stock
16  Purchase Plan . . . . Meetings of the Compensation Committee are also attended by
George Perlegos, the Company's President and Chief Executive Officer, and Kris
17  Chellam, the Company's Chief Financial Officer, who provide background and
market information and make recommendations to the Compensation Committee on
18  salary levels, officer performance objectives and corporate financial goals . . . .All
options are granted at the current market price of the Company's Common Stock on
19  the date of grant.

20  297.   All of the above statements concerning the value of the stock options on the date of

21  grant was knowingly false and misleading because the option grants to defendants Guest Perlegos,

22  Wu, and Chellam, Peckman purportedly on April 11, 1997 were backdated and were granted at less

23  than the current market price as reported by Compensation Committee members Hall and Thomas

24  and as prohibited by Atmel's stock option plans. Contrary to the above representations, none of the

25  backdated options was ever approved by the shareholders, nor were shareholders ever aware of this

26  illicit compensation.

27

28

1    1999 Proxy Statement

2    298.    In Atmel's proxy statement filed with the SEC on March 17, 2000, defendants

3    George Perlegos, Gust Perlegos, Hall and Thomas falsely reported that options granted to Colvin

4    were granted on February 12, 1999, options granted to Sisois were granted on June 11, 1999 and

5    other options granted to Colvin and Katz were granted on July 16, 1999, and that the exercise

6    prices of these options were equal to the "current market price of [the Company's] common stock

7    on the date of grant."

8    299.    Defendants George Perlegos, Gust Perlegos, Ross, Hall and Thomas knew the above

9    statements were false because they had actually issued the grants at later dates than the ones

10   reported in the 1999 Proxy Statement.    Defendants George Perlegos, Gust Perlegos, Hall and

11   Thomas made the following representations about Atmel's granting practices and stock option

12   plans:

13   **REPORT OF THE COMPENSATION COMMITTEE**

14   The Compensation Committee of the Board of Directors generally reviews and
15   approves the Company's executive compensation policies, including the base salary
     levels and target incentives for executive officers of the Company at the beginning
16   of each year, and approves the performance objectives of the Company's officers in
     their areas of responsibility. The Compensation Committee also administers the
17   Company's stock plans, including its 1996 Stock Plan and the 1991 Employee Stock
     Purchase Plan . . . . Meetings of the Compensation Committee are also attended by
18   George Perlegos, the Company's President and Chief Executive Officer, who
     provides background and market information and make recommendations to the
19   Compensation Committee on salary levels, officer performance objectives and
     corporate financial goals . . . . All options are granted at the current market price of
20   the Company's Common Stock on the date of grant . . . .

21   300.    All of the above statements concerning the value of the stock options on the date of

22   grant was knowingly false and misleading because the option grants made purportedly on February

23   12, 1999, June 11, 1999 and July 16, 1999 were backdated and were granted at less than the current

24   market price as reported by Compensation Committee members Hall and Thomas and as prohibited

25   by Atmel's stock option plans.    Contrary to the above representations, none of the backdated

26   options was ever approved by the shareholders, nor were shareholders ever aware of this illicit

27   compensation.

28

1  2000 Proxy Statement

2       301.    In Atmel's 2000 proxy statement filed with the SEC on March 15, 2001, Defendants

3  George Perlegos, Gust Perlegos, Hall, Thomas and Fougere falsely reported that options granted to

4  Colvin were granted on November 17, 2000 and that the exercise prices of these options were

5  equal to the "current market price of [the Company's] common stock on the date of grant" when

6  they knew the statements were false because they had actually issued the March 15, 2001 grant at a

7  later date.    Defendants George Perlegos, Gust Perlegos, Hall, Thomas and Fougere made the

8  following representations about Atmel's granting practices and stock option plans:

9      **REPORT OF THE COMPENSATION COMMITTEE**

10      The Compensation Committee of the Board of Directors generally reviews and
approves our executive compensation policies, including the base salary levels and

11  target incentives for our executive officers at the beginning of each year, and
approves the performance objectives of the officers in their areas of responsibility.

12  The Compensation Committee also administers our stock plans, including our 1996
Stock Plan and our 1991 Employee Stock Purchase Plan . . . . Meetings of the

13  Compensation Committee are also attended by George Perlegos, our President and
Chief Executive Officer, who provides background and market information and

14  makes recommendations to the Compensation Committee on salary levels, officer
performance objectives, and corporate financial goals . . . . All options are granted

15  at the current market price of our common stock on the date of grant . . . .

16      302.    All of the above statements concerning the value of the stock options on the date of

17  grant was knowingly false and misleading because the option grant made purportedly on

18  November 17, 2000 were backdated and were granted at less than the current market price as

19  reported by Compensation Committee members Hall, Thomas and Fougere and as prohibited by

20  Atmel's stock option plans.    Contrary to the above representations, none of the backdated options

21  was ever approved by the shareholders, nor were shareholders ever aware of this illicit

22  compensation.

23  2001 Proxy Statement

24      303.    In Atmel's 2001 proxy statement filed with the SEC on March 21, 2002, Defendants

25  George Perlegos, Gust Perlegos, Hall, Thomas and Fougere falsely reported that options granted to

26  Colvin were granted on September 17, 2001 and that the exercise prices of these options were

27  equal to the "current market price of [the Company's] common stock on the date of grant," when

28  they knew the statements were false because they had actually issued the September 17, 2001 grant

at a later date.  Defendants George Perlegos, Gust Perlegos, Hall, Thomas and Fougere made the following representations about Atmel's granting practices and stock option plans:

### REPORT OF THE COMPENSATION COMMITTEE

> The Compensation Committee of the Board of Directors generally reviews and approves our executive compensation policies, including the base salary levels and target incentives for our executive officers at the beginning of each year, and approves the performance objectives of the officers in their areas of responsibility. The Compensation Committee also administers our stock plans, including our 1996 Stock Plan and our 1991 Employee Stock Purchase Plan . . . . Meetings of the Compensation Committee are also attended by George Perlegos, our President and Chief Executive Officer, who provides background and market information and makes recommendations to the Compensation Committee on salary levels, officer performance objectives, and corporate financial goals . . . . All options are granted at the current market price of our common stock on the date of grant . . . .

304.    All of the above statements concerning the value of the stock options on the date of grant was knowingly false and misleading because the option grant made purportedly on September 17, 2001 were backdated and were granted at less than the current market price as reported by Compensation Committee members Hall, Thomas and Fougere and as prohibited by Atmel's stock option plans.  Contrary to the above representations, none of the backdated options was ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

2002 Proxy Statement

305.    In Atmel's proxy statement filed with the SEC on March 24, 2003, Defendants George Perlegos, Gust Perlegos, Hall, Thomas, Fougere and Kim falsely reported that options granted to Gust Perlegos, Wu, Colvin, and Sisois were granted on November 14, 2002, when they knew the statements were false because they had actually issued the November 14, 2002 grant at a later date.  Defendants George Perlegos, Gust Perlegos, Hall, Thomas, Fougere, and Kim made the following representations about Atmel's granting practices and stock option plans:

### REPORT OF THE COMPENSATION COMMITTEE

> The Compensation Committee of the Board of Directors generally reviews and approves our executive compensation policies, including the base salary levels and target incentives for our executive officers, at the beginning of each year, and approves the performance objectives of the officers in their areas of responsibility. The Compensation Committee also administers our stock plans, including our 1996 Stock Plan and our 1991 Employee Stock Purchase Plan . . . . Meetings of the Compensation Committee are also attended by George Perlegos, our President and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

89

Chief Executive Officer, who provides background and market information and makes recommendations to the Compensation Committee on salary levels, officer performance objectives, and corporate financial goals . . . . All options are granted at the current market price of our common stock on the date of grant . . . .

306.    All of the above statements concerning the value of the stock options on the date of grant was knowingly false and misleading because the option grants made purportedly on November 14, 2002 were backdated and were granted at less than the current market price as reported by Compensation Committee members Hall, Thomas, Fougere and Kim and as prohibited by Atmel's stock option plans.    Contrary to the above representations, none of the backdated options was ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

2003 Proxy Statement

307.    In Atmel's proxy statement filed with the SEC on March 30, 2004, Defendants George Perlegos, Gust Perlegos, Hall, Thomas, Fougere and Kimfalsely reported that options granted to Barton were granted on April 30, 2003 and that the exercise price of these options was equal to the "fair market value per share of [the Company's] common stock on the date of grant." The Board (George Perlegos, Hall, Thomas, Fougere and Kim),with the knowledge and participation of Gust Perlegos and Ross, knew that the statements were false because they had actually issued the April 30, 2003 grant at a later date as the entire Board had the authority to grant options in 2003.    Defendants George Perlegos, Gust Perlegos, Hall, Thomas, Fougere and Kim made the following representations about Atmel's granting practices and stock option plans:

**REPORT OF THE COMPENSATION COMMITTEE**

The Compensation Committee of the Board of Directors generally reviews and approves our executive compensation policies, including the base salary levels and target incentives for our executive officers, at the beginning of each year, and approves the performance objectives of the officers in their areas of responsibility. The Compensation Committee also administers our stock plans, including our 1996 Stock Plan and our 1991 Employee Stock Purchase Plan . . . . In fiscal 2003, the Board of Directors, as a whole, assumed these responsibilities.    However, in 2004, all executive officer compensation will be determined exclusively by the Compensation Committee . . . . Upon recommendation of our independent directors, the Board of Directors approved option grants to executive officers during 2003. All options are granted at the current market price of our common stock on the date of grant . . . .

308.    All of the above statements concerning the value of the stock options on the date of grant was knowingly false and misleading because the option grants made purportedly on April 30, 2003 were backdated and were granted at less than the current market price as reported by Board members George Perlegos, Hall, Thomas, Fougere and Kim and as prohibited by Atmel's stock option plans.    Contrary to the above representations, none of the backdated options was ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

False Form 4s

309.    From 2003 to 2004, Atmel, with the knowledge, approval and participation of Defendants George Perlegos, Gust Perlegos, Ross, Hall, Thomas, Fougere and Kim, for the purpose and with the effect of concealing the improper option backdating, filed with the SEC Form 4s that falsely reported the dates of stock option grants to defendants Barton, Turner, Pruniaux and Schumann, as follows:

a.    Turner's Form 4 filed with the SEC on November 5, 2003 falsely reported that options granted to Turner had been granted on February 4, 1994;

b.    Turner's Form 4 filed with the SEC on January 6, 2004 falsely reported that options granted to Turner had been granted on February 4, 1994;

c.    Turner's Form 4 filed with the SEC on September 27, 2004 falsely reported that options granted to Turner had been granted on October 9, 1998 and April 11, 1997;

d.    Schumann's Form 4 filed with the SEC on February 13, 2006 falsely reported that options granted to Schumann had been granted on February 22, 1995;

e.    Pruniaux's Form 4 filed with the SEC on May 31, 2005 falsely reported that options granted to Pruniaux had been granted on October 9, 1998;

f.    Turner's Form 4 filed with the SEC on September 27, 2004 falsely reported that options granted to Turner had been granted on April 11, 1997 and October 9, 1998;

g.    Turner's Form 4 filed with the SEC on October 28, 2003 falsely reported that options granted to Turner had been granted on July 16, 1999, November 17, 2000 and September 17, 2001; and

h.    Barton's Form 4 filed with the SEC on May 27, 2004 falsely reported that options granted to Barton had been granted on May 1, 2003.

**Revelation of Options Backdating at Atmel**

310.    Defendants George Perlegos, Gust Perlegos, Ross, Hall, Thomas, Fougere and Kim continued to conceal their foregoing misconduct until at least July 25, 2006, when, as set forth

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                                91

1    above, the Company announced that it had initiated an internal review into its historical stock

2    option granting practices and related accounting.

3        311.  On July 25, 2006, Atmel issued a press release announcing that the Audit

4    Committee was reviewing the company's practices relating to its stock option grants, stating:

5            Atmel Corporation announced today that it has postponed its second quarter 2006
            earnings announcement and conference call previously scheduled for July 25, 2006.
6            The Company also announced that the Audit Committee of the Company's Board
            of Directors has initiated an independent investigation regarding timing of past
7            stock option grants and other potentially related issues.  The Audit Committee is
            being assisted by independent legal counsel and independent accounting
8            consultants.    The Audit Committee will make every effort to complete its
            investigation as soon as practicable.  The Company will not announce its second-
9            quarter results or file its quarterly report on Form 10-Q for the quarter ended June
            30, 2006 until after the completion of the investigation.  The Company does not
10           expect the investigation to be completed prior to the due date for the Company's
            second-quarter 10-Q, August 9, 2006, or the extended due date of August 14, 2006.
11           Atmel executives will refrain from commenting further until the independent
            investigation is concluded.
12
        312.  On August 15, 2006, the Company announced that it received a request for
13
    information from the San Francisco District Office of the SEC relating to its past stock option
14
    grants and that it also received a staff determination notice from NASDAQ indicating that, because
15
    the Company had failed to timely file its Form 10-Q for the quarter ended June 30, 2006, it faced
16
    delisting.
17
            Atmel Corporation, a global leader in the development and fabrication of advanced
18           semiconductor solutions, today announced that it will request a hearing before the
            NASDAQ Listing Qualifications Panel to review a NASDAQ Staff Determination
19           notice stating that the Company is not in compliance with NASDAQ Marketplace
            Rule 4310(c)(14), and that the Company's common stock is subject to delisting,
20           because the Company has not timely filed its second quarter Form 10-Q for the
            period ended June 30, 2006.  The hearing request will automatically stay the
21           delisting of Atmel's common stock, and shares of Atmel common stock will
            continue trading on the NASDAQ, pending the outcome of the Panel's decision.
22           There can be no assurance that the Panel will grant a request for continued listing.

23           Atmel also announced today that it had received an informal request for information
            from the San Francisco District Office of the Securities and Exchange Commission
24           relating to the Company's past granting of stock options.  The Company intends to
            cooperate fully with all matters related to this request.
25
            On July 25, 2006, Atmel announced that the Audit Committee of the Company's
26           Board of Directors had initiated an independent investigation regarding timing of
            past stock option grants and other potentially related issues.  As a result of the
27           continuing investigation, the Company did not file its second quarter Form 10-Q by
            the extended due date of August 14, 2006.  The Audit Committee, assisted by
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                              92

independent legal counsel and independent accounting consultants, will make every effort to complete the investigation and file its Form 10-Q as soon as practicable.

313.    On August 17, 2006, Atmel issued a press release providing an update on its Audit Committee investigation. Therein, the Company stated:

> The Company announced on July 25, 2006, that the Audit Committee of the Company's Board of Directors had initiated an independent investigation regarding timing of past stock option grants and other potentially related issues. The Audit Committee is being assisted by independent legal counsel and independent accounting consultants and will make every effort to complete the investigation as soon as practicable. The financial information in this release was compiled by the management of Atmel Corporation and has not been audited or reviewed by the Company's independent registered public accounting firm. The financial information is preliminary and subject to potentially material adjustment depending on the outcome of the investigation. Any reliance placed on this unaudited and unreviewed financial information is to be done with the full understanding and acceptance of the foregoing uncertainties. As a result of the continuing investigation, the Company did not file its second quarter Form 10-Q by the extended due date of August 14, 2006, and is unable to provide additional financial information for the second quarter of 2006 at this time.

## ATMEL'S FALSE FINANCIAL REPORTING

## IN VIOLATION OF GAAP, SEC REGULATIONS AND IRS RULES

314.    As a result of Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere, and Kim's improper backdating of stock options, Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere, and Kim caused Atmel to violate GAAP, SEC regulations and IRS rules and regulations.

315.    Atmel's financial results for 1994 through 2005 were included in reports filed with the SEC and in other shareholder reports. In these reports, Defendants George Perlegos, Gust Perlegos, Chellam, Hall, Thomas, Fougere, and Kim represented that Atmel's financial results were presented in a fair manner and in accordance with GAAP.

316.    Defendants George Perlegos, Gust Perlegos, Chellam, Hall, Thomas, Fougere, and Kim's representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

93

1    317.    GAAP consists of those principles recognized by the accounting profession as the

2    conventions, rules, and procedures necessary to define accepted accounting practice at the

3    particular time. Regulation S-X, to which the Company is subject as a registrant under the

4    Exchange Act, 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC,

5    which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

### Violations of GAAP

7    318.    During the relevant period, Defendants George Perlegos, Gust Perlegos, Chellam,

8    Hall, Thomas, Fougere, and Kim caused the Company to understate its compensation expense by

9    not properly accounting for its stock options under GAAP and thus overstated the Company's net

10    earnings.

11    319.    Under well-settled accounting principles in effect throughout the relevant period,

12    Atmel did not need to record an expense for options granted to employees at the current market

13    price (at-the-money). The Company was, however, required to record an expense in its financial

14    statements for any options granted below the current market price (in-the-money).  In order to

15    provide Atmel executives and employees with far more lucrative in-the-money options, while

16    avoiding having to inform shareholders about millions of dollars incurred by the Company in

17    compensation expenses (and without paying the IRS millions of dollars in employment taxes),

18    Defendants George Perlegos, Gust Perlegos, Chellam, Hall, Thomas, Fougere, and Kim

19    systematically falsified Company records to create the false appearance that options had been

20    granted at the market price on an earlier date.

21    320.    Throughout the relevant period, Atmel accounted for stock options using the

22    intrinsic method described in APB 25, "Accounting for Stock Issued to Employees." Under APB

23    25, employers were required to record as an expense on their financial statements the "intrinsic

24    value" of a fixed stock option on its "measurement date." An option that is in-the-money on the

25    measurement date has intrinsic value, and the difference between its exercise price and the quoted

26    market price must be recorded as compensation expense to be recognized over the vesting period

27    of the option.  Options that are at-the-money or out-of-the-money on the measurement date need

28    not be expensed.   Excluding non-employee directors, APB 25 required employers to record

1    compensation expenses on options granted to non-employees irrespective of whether they were in-

2    the-money or not on the date of grant.

3    ### Atmel's GAAP Violations Were Material

4    321.    Atmel's false and misleading relevant period statements and omissions regarding its

5    accounting were material, particularly in light of SEC guidance on materiality.    SEC Staff

6    Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality.

7    Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood

8    that a reasonable person would consider it important."    It also stresses that materiality requires

9    qualitative, as well as quantitative, considerations.    For example, if a known misstatement would

10   cause a significant market reaction, that reaction should be taken into account in determining the

11   materiality of the misstatement.

12   322.    SAB Topic 1M further states:

13   among the considerations that may well render material a quantitatively small
     misstatement of a financial statement item are --

14

15   *        *        *

16   whether the misstatement masks a change in earnings or other trends

17   whether the misstatement hides a failure to meet analysts' consensus expectations
     for the enterprise

18   *        *        *

19   whether the misstatement concerns a segment or other portion of the registrant's
     business that has been identified as playing a significant role in the registrant's
20   operations or profitability.

21   323.    SAB Topic 1M also says that an intentional misstatement of even immaterial items

22   may be illegal and constitute fraudulent financial reporting.

23   324.    Atmel's misstatements satisfy these criteria and thus were material from both a

24   quantitative and qualitative perspective.

25   ### Atmel's Financial Statements Violated Fundamental Concepts of GAAP

26   325.    Due to these accounting improprieties, the Company presented its financial results

27   and statements in a manner that violated GAAP, which are described by the following statements:

28

(a)  The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b)  The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, ¶34);

(c)  The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶40);

(d)  The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)  The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)  The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

326.  Further, the undisclosed adverse information concealed by Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere, and Kim during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### Atmel's Financial Statements Violated SEC Regulations

327.  During the relevant period, Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere, and Kim caused Atmel to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

328.    328.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers – the Company's CEO and its next four most highly paid executives.  Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year.  In the summary compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period.  Item 402(b)(2)(iii)(C)(2).  In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options. . . . If such exercise or base price is less than the market price of the underlying security on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant. . . ."    Item 402(c)(2)(iv).

329.    Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere, and Kim caused Atmel to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted options with exercise prices below the market value on the date the Board or Compensation Committee approved the grant.

### Violations of IRS Rules and Regulations

330.    During the relevant period, Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere, and Kim further caused Atmel to violate IRS rules and regulations due to its improper accounting for the backdated stock options.  As a result, the Company's tax liabilities were understated, exposing Atmel to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

331.    Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere, and Kim caused the Company to violate Section 162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based."  In order for compensation to be

1    performance-based, the Compensation Committee must have set pre-established and objective

2    performance goals. The goals must then be approved by the shareholders. Section 162(m) defines

3    stock options as performance-based provided they are issued at an exercise price that is no less than

4    the fair market value of the stock on the date of the grant. Accordingly, properly issued stock

5    options do not have to be taken into account in calculating whether an executive's compensation

6    has exceeded the $1 million compensation cap.

7      332.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie

8    top executives' soaring pay packages more closely to a company's performance. This change in

9    the tax law turned compensation practices for a company's top executives away from straight

10   salary-based compensation to performance-based compensation, including stock options.

11   According to former SEC Chairman Harvey Pitt: "What [162[m]] did was create incentives to find

12   other forms of compensation so people could get over the $1 million threshold without running

13   afoul of the code."

14     333.    Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere,

15   and Kim caused Atmel to violate Section 162(m) by providing backdated options to the Company's

16   named executive officers, which were granted with exercise prices that were less than the fair

17   market value of the stock on the date of the grant. As a result all of the income resulting from the

18   exercise of the options must be included for purposes of calculating whether the named executive's

19   compensation exceeds the $1 million cap for federal tax purposes.

20     334.    Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere,

21   and Kim further caused the Company to violate IRS rules and regulations in order to avoid having

22   to withhold income and FICA tax from its executives and employees upon the exercise of Atmel's

23   stock options by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive

24   Stock Options ("ISOs").

25     335.    ISOs are a form of equity compensation that may be provided to a company's

26   employees. ISOs are required to be granted at an exercise price that is no less than the fair market

27   value of the stock on the date of the grant and are entitled to preferential tax treatment as they are

28   not subject to income tax upon exercise of the options but only upon sale of the stock (except for

the possible imposition of alternative minimum tax on the option spread at the time of exercise). Stock options that do not qualify as ISOs are considered to be NSOs. NSOs are not entitled to preferential treatment as they are subject to income tax and FICA withholding upon exercise. As a result, a company that fails to withhold income tax and/or FICA upon the exercise of NSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

336.    By improperly treating its backdated options as ISOs, Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere, and Kim failed to provide proper income tax and FICA withholdings upon the exercise of its options by its executives and employees in violation of IRS rules and regulations.

337.    The chart below illustrates Atmel's false and misleading fiscal and quarterly financial results which materially understated its compensation expenses and thus overstated its earnings:

| Fiscal Year | Reported Earnings (Loss) | Reported Basic Earnings (Loss) Per Share |
|---|---|---|
| 1994 | $59.450 million | $0.69 |
| 1995 | $113.693 million | $1.20 |
| 1996 | $201.722 million | $2.06 |
| 1997 | $1.801 million | $0.02 |
| 1998 | $(50.038) million | $(0.12) |
| 1999 | $53.379 million | $0.14 |
| 2000 | $265.976 million | $0.59 |
| 2001 | $(418.348) million | $(0.90) |
| 2002 | $(641.796) million | $(1.37) |
| 2003 | $(117.996) million | $(0.25) |
| 2004 | $(2.434) million | $(0.01) |
| 2005 | $(32.898) million | $(0.07) |

## INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

338.    In a misguided effort to attract and retain employees in a competitive environment, Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere, and Kim exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating

1  scheme. Their misconduct was unjustifiable and constituted a gross breach of their fiduciary duties

2  as officers and/or directors of the Company.   Specifically, Defendants George Perlegos, Gust

3  Perlegos, Ross, Chellam, Hall, Thomas, Fougere, and Kim breached their fiduciary duties by:

    a.     colluding with each other to backdate stock option grants;

    b.     colluding with each other to violate GAAP and Section 162(m);

    c.     colluding with each other to produce and disseminate false financial statements to Atmel shareholders and the market that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.     colluding with each other to file false proxy statements, false financial statements, and false Form 4s in order to conceal the improper backdating of stock options.

10      339.   Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere,

11  and Kim's foregoing misconduct was not, and could not have been, an exercise of good faith

12  business judgment. Rather, it was intended to, and did, unduly benefit defendants Gust Perlegos,

13  Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann at the

14  expense of the Company.

15      340.   As a direct and proximate result of Defendants George Perlegos, Gust Perlegos,

16  Ross, Chellam, Hall, Thomas, Fougere, and Kim's foregoing breaches of fiduciary duties, the

17  Company has sustained millions of dollars in damages, including, but not limited to, the additional

18  compensation expenses and tax liabilities the Company will be required to incur, the loss of funds

19  paid to the Company upon the exercise of stock options resulting from the difference between the

20  fair market value of the stock option on the true date of grant and the price that was actually paid as

21  a result of the backdated stock option grant, the costs associated with the Company's internal

22  investigation, costs and expenses incurred in connection with the Company's restatement of

23  historical financial results, and costs and expenses incurred in connection with the SEC

24  investigation of the Company.

25      341.   Defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton,

26  Turner, Pruniaux and Schumann have exercised numerous backdated options at improperly low

27  prices and have then sold the shares for substantial profits. Consequently, these defendants have

28  been unjustly enriched by garnering millions of dollars in illicit profits and depriving the Company

of millions of dollars in payments that the Company should have received upon exercise of the options.

## INSIDER SALES AND IMPROPER PROFITS

342.    In disregard of their duties of trust and fidelity, during the relevant period, Atmel insiders Chellam, Hall, Gust Perlegos, George Perlegos and Thomas sold significant amounts of Atmel stock while in the possession of materially adverse non-public information regarding the Company, i.e., the backdating scheme in which they all participated and of which they all knew. The backdating scheme also allowed defendants Chellam, Hall, Gust Perlegos, George Perlegos and Thomas to sell Atmel stock obtained through options for greater profit. From April 1997 to the present, upon information and belief, Defendants Chellam, Hall, Gust Perlegos, George Perlegos and Thomas herein, sold a total of 2,012,160 shares of Atmel common stock for gross proceeds of approximately $16,903,704.02.

**Defendant Chellam**

343.    During the relevant period, CFO Chellam sold a total of 419,160 shares of Atmel common stock, recognizing $1,271,506.52 in proceeds.

| Date | Split Adjusted # of Shares Sold | Split Adjusted Price per Share | Proceeds |
|---|---|---|---|
| 4/24/1997 | 20,000 | $5.72 | $114,400.00 |
| 4/24/1997 | 2,000 | $5.56 | $11,125.00 |
| 7/15/1997 | 40,000 | $8.47 | $338,800.00 |
| 11/13/1997 | 20,000 | $5.79 | $115,950.00 |
| 7/28/1998 | 20,000 | $2.76 | $55,312.50 |
| 7/31/1998 | 32,000 | $2.72 | $87,260.00 |
| 8/4/1998 | 40,000 | $2.44 | $97,810.00 |
| 8/6/1998 | 40,000 | $2.57 | $103,125.00 |
| 8/20/1998 | 20,000 | $2.28 | $45,625.00 |
| 8/28/1998 | 52,580 | $1.61 | $84,999.51 |
| 8/28/1998 | 52,580 | $1.61 | $84,999.51 |
| 8/28/1998 | 40,000 | $1.64 | $65,600.00 |
| 8/31/1998 | 40,000 | $1.66 | $66,500.00 |
| Total | 419,160 | | $1,271,506.52 |

**Defendant Hall**

344.    During the relevant period, Audit Committee and Compensation Committee member Hall sold a total of 128,000 shares of Atmel common stock, recognizing $2,560,000.00 in proceeds.

| Date | Split Adjusted # of Shares Sold | Split Adjusted Price per Share | Proceeds |
|------|------|------|------|
| 8/31/2000 | 128,000 | $20.00 | $2,560,000.00 |
| Total | 128,000 | | $2,560,000.00 |

**Defendant Gust Perlegos**

345.    During the relevant period, Gust Perlegos sold a total of 340,000 shares of Atmel common stock, recognizing $2,295,937.50 in proceeds.

| Date | Split Adjusted # of Shares Sold | Split Adjusted Price per Share | Proceeds |
|------|------|------|------|
| 8/6/1999 | 20,000 | $8.57 | $171,562.50 |
| 8/11/1999 | 60,000 | $9.25 | $555,000.00 |
| 8/24/1999 | 40,000 | $10.45 | $418,125.00 |
| 2/25/2000 | 20,000 | $21.94 | $438,750.00 |
| 7/23/2002 | 125,000 | $3.66 | $457,500.00 |
| 7/24/2002 | 75,000 | $3.40 | $255,000.00 |
| Total | 340,000 | | $2,295,937.50 |

**Defendant George Perlegos**

346.    During the relevant period, Defendant George Perlegos sold a total of 125,000 shares of Atmel common stock, recognizing $457,500.00 in proceeds.

| Date | Split Adjusted # of Shares Sold | Split Adjusted Price per Share | Proceeds |
|------|------|------|------|
| 7/23/2002 | 125,000 | $3.66 | $457,500.00 |
| Total | 125,000 | | $457,500.00 |

**Defendant Thomas**

347.    During the relevant period, Audit Committee and Compensation Committee member Thomas sold a total of 1,000,000 shares of Atmel common stock, recognizing $10,318,760.00 in proceeds.

| Date | Split Adjusted # of Shares Sold | Split Adjusted Price per Share | Proceeds |
|------|------|------|------|
| 8/24/1999 | 300,000 | $10.36 | $3,109,500.00 |
| 8/26/1999 | 200,000 | $9.97 | $1,993,750.00 |
| 8/31/1999 | 144,000 | $9.93 | $1,431,000.00 |
| 11/3/1999 | 160,000 | $10.61 | $1,697,600.00 |
| 11/4/1999 | 196,000 | $10.64 | $2,086,910.00 |
| Total | 1,000,000 | | $10,318,760.00 |

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

348.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties, unjust enrichment, statutory violations, and/or other violations.

349.    Plaintiff is an owner of Atmel common stock and was an owner of Atmel common stock at times relevant hereto.

350.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

351.    As a result of the facts set forth herein, Plaintiff has not made any demand on Atmel's Board of Directors to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

352.    The Board currently consists of eight directors: defendants Fougere, Thomas, Kim and Wu and directors Sugishita, Laub, Papken Der Torossian and Jack L. Saltich. A majority of the directors was individually incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.

353.    The following chart summarizes the positions of the foregoing directors:

| Defendant | Recipient of Back-Dated Option Grants | Member of Compensation Committee at time of backdated option grants | Member of Audit Committee at time of backdated option grants | Signed the Company's 10-Ks at time of backdated option grants |
|---|---|---|---|---|
| Thomas | | X | X | X |
| Fougere | | X | X | X |
| Kim | | X | X | X |
| Wu | X | | | X |

## Thomas

354.    Defendant Thomas is interested in the transactions complained of herein because he faces a substantial likelihood of being held liable for: (1) knowingly and deliberately approving the

1  backdated options as a member of the Compensation Committee during the relevant period and (2)

2  knowingly and deliberately approving the filing of false financial statements and other false SEC

3  filings as a member of the Audit Committee during the relevant period. Thomas, as a member of

4  the Compensation Committee since 1994, was responsible for approving the option grants to

5  executive officers including the backdated stock option grants as alleged herein. As alleged herein,

6  Thomas knowingly and deliberately participated in and approved the improper backdating of stock

7  options, and, as a member of the Audit Committee since 1994, knowingly and deliberately

8  participated in and approved the Company's filing of false financial statements and other false SEC

9  filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct

10  complained of herein. Thus, at the time this suit was commenced, Defendant Thomas was not

11  capable of disinterestedly and independently considering a pre-suit demand to commence this

12  litigation.

13      355.   Moreover, in connection with the proxy statements dated March 22, 1995, March

14  19, 1996, March 19, 1998, March 17, 2000, March 15, 2001, March 21, 2002, March 24, 2003 and

15  March 30, 2004, Thomas knowingly and intentionally misrepresented Atmel's compensation

16  practices while simultaneously seeking shareholder approval to increase the authorized number of

17  Company shares in order to provide the necessary shares for, inter alia, grants under employee

18  benefit and employee stock incentive plans.

19      356.   Thomas received more than $10.3 million in illegal proceeds from his sale of Atmel

20  stock.

21                        **Fougere**

22      357.   Defendant Fougere is interested in the transactions complained of herein because he

23  faces a substantial likelihood of being held liable for: (1) knowingly and deliberately approving the

24  backdated options as a member of the Compensation Committee during the relevant period and (2)

25  knowingly and deliberately approving the filing of false financial statements and other false SEC

26  filings as a member of the Audit Committee at all relevant times. Fougere, as a member of the

27  Compensation Committee since 2000, was responsible for approving the option grants to executive

28  officers including the backdated stock option grants as alleged herein. As alleged herein, Fougere

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT            104

knowingly and deliberately participated in and approved the improper backdating of stock options, and, as a member of the Audit Committee since 2000, knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein. Thus, at the time this suit was commenced, Defendant Fougere was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

358. Moreover, in connection with the proxy statements dated March 17, 2000, March 15, 2001, March 21, 2002, March 24, 2003 and March 30, 2004, Fougere knowingly and intentionally misrepresented Atmel's compensation practices while simultaneously seeking shareholder approval to increase the authorized number of Company shares in order to provide the necessary shares for, inter alia, grants under employee benefit and employee stock incentive plans.

### Kim

359. Defendant Kim is interested in the transactions complained of herein because he faces a substantial likelihood of being held liable for: (1) knowingly and deliberately approving the backdated options as a member of the Compensation Committee during the relevant period and (2) knowingly and deliberately approving the filing of false financial statements and other false SEC filings as a member of the Audit Committee during the relevant period. Kim, as a member of the Compensation Committee in 2002 and as a Board member in 2003, was responsible for approving the option grants to executive officers including the backdated stock option grants as alleged herein. As alleged herein, Kim knowingly and deliberately participated in and approved the improper backdating of stock options, and, as a member of the Audit Committee since 2002, knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein. Thus, at the time this suit was commenced, Defendant Kim was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

360. Moreover, in connection with the proxy ptatements dated March 21, 2002, March 24, 2003 and March 30, 2004, Kim knowingly and intentionally misrepresented Atmel's

1    compensation practices while simultaneously seeking shareholder approval to increase the

2    authorized number of Company shares in order to provide the necessary shares for, inter alia,

3    grants under employee benefit and employee stock incentive plans.

### Wu

5        361.    Wu is directly interested in the improperly backdated stock option grants that are the

6    subject of this Action.  During the relevant period, Wu received backdated stock options to

7    purchase at least 680,000 shares of Atmel common stock.

8        362.    Furthermore, Wu's principal professional occupation at the time this action was

9    commenced was his employment as Atmel's Executive Vice President, Office of the President, for

10   which he earned hundreds of thousands of dollars in annual salary, bonuses and other

11   compensation, all of which required approval by defendants Fougere and Thomas and director

12   Sugishita, who are current members of the Compensation Committee.  In 2005, for his service as

13   Executive Vice President, Office of the President, Wu received a salary of $502,711, a bonus of

14   $75,000 and a grant of 100,000 stock options.  Thus, at the time this suit was commenced,

15   Defendant Wu was not capable of disinterestedly and independently considering a pre-suit demand

16   to commence this litigation.

### Backdating Is Not a Valid Exercise of the Business Judgment Rule

18       363.    Furthermore, demand is excused because the misconduct complained of herein was

19   not, and could not have been, an exercise of good faith business judgment.  As represented in

20   Atmel's proxy statements, the stated purposes of the Company's shareholder-approved stock

21   option plans are to attract and retain the best available personnel for positions of substantial

22   responsibility with Atmel, to provide additional incentive to the Company's employees and

23   consultants, and to promote the success of the Company's business. However, by granting options

24   with backdated exercise prices, defendants Thomas, Fougere and Kim undermined the purpose of

25   the stock option plans by awarding employees compensation that had intrinsic value regardless of

26   Atmel's stock performance.  In effect, this practice was nothing more than secret handouts to

27   executives and employees at the expense of unsuspecting shareholders and the Company.

28

364.    Defendants Thomas, Fougere and Kim could have achieved the stated purposes of "attract[ing] and retain[ing] the best available personnel for positions of substantial responsibility with Atmel, provid[ing] additional incentive to the Company's employees and consultants and promot[ing] the success of the Company's business" by granting those employees additional options under their incentive plans, or by granting options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants.  Instead, defendants Thomas, Fougere and Kim attracted and retained Atmel's employees by backdating option grants in violation of the Company's shareholder-approved stock option plans and improperly reporting these grants in their financial disclosures to improve the Company's bottom line.

365.    The practice of backdating stock options cannot be a valid exercise of business judgment because it has subjected Atmel to potentially massive liability.  Atmel has admitted to backdating stock option grants and has expended significant funds investigating the Company's historical option granting practices.  The Company also restated its previously-issued financial statements due to errors in accounting for compensation expenses in the amount of $116 million. The SEC has also initiated its own investigation into the Company's prior option grants.  Atmel will likely suffer tax liabilities for the additional compensation they will have to expense as the result of backdated options, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

### COUNT I

**Against Defendants George Perlegos, Gust Perlegos, Chellam, Ross, Hall, Thomas, Fougere and Kim for Violations of §10(b) and Rule 10b-5 of the Securities and Exchange Act**

366.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

367.    Throughout the relevant period, defendants George Perlegos, Gust Perlegos, Chellam, Ross, Hall, Thomas, Fougere and Kim individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Company.

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                        107

368.   Defendants George Perlegos, Gust Perlegos, Chellam, Ross, Hall, Thomas, Fougere and Kim, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers and/or directors of the Company, defendants George Perlegos, Gust Perlegos, Chellam, Ross, Hall, Thomas, Fougere and Kim were able to and did control the conduct complained of herein.

369.   Defendants George Perlegos, Gust Perlegos, Chellam, Ross, Hall, Thomas, Fougere and Kim acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Defendants George Perlegos, Gust Perlegos, Chellam, Hall, Ross, Thomas, Fougere and Kim were among the senior management and/or directors of the Company and were therefore directly responsible for the fraud alleged herein.

370.   The Company relied upon defendants George Perlegos, Gust Perlegos, Chellam, Hall, Ross, Thomas, Fougere and Kim's fraud in granting defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann options to purchase shares of the Company's common stock, as alleged herein.

371.   As a direct and proximate result of defendants George Perlegos, Gust Perlegos, Chellam, Ross, Hall, Thomas, Fougere and Kim's fraud, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant, the costs associated with the Company's internal investigation, costs and expenses incurred in connection with the Company's restatement of historical financial results, and costs and expenses incurred in connection with the SEC investigation of the Company.

## COUNT II

### Against Defendants George Perlegos, Gust Perlegos, Chellam, Hall, Thomas, Fougere and Kim for Violations of §14(a) of the Securities Exchange Act

372.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

373.    Rule 14-A-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14-A-9.

374.    The proxy statements described herein violated §14(a) and Rule 14-A-9 because defendants George Perlegos, Gust Perlegos, Chellam, Hall, Thomas, Fougere and Kim omitted material facts, including the fact that they were causing Atmel to engage in an option backdating scheme, a fact which defendants George Perlegos, Gust Perlegos, Chellam, Hall, Thomas, Fougere and Kim were aware of and participated in from at least 1994.

375.    Defendants George Perlegos, Gust Perlegos, Chellam, Hall, Thomas, Fougere and Kim knew that the proxy statements were materially false and misleading.

376.    The misrepresentations and omissions in the proxy statements were material.  The proxy statements were an essential link in the accomplishment of the continuation of Defendants George Perlegos, Gust Perlegos, Chellam, Hall, Thomas, Fougere and Kim's unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of the shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

377.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT III

**Against Defendants George Perlegos, Gust Perlegos, Chellam, Hall, Thomas, Fougere and Kim For Violations of §20(a) of the Securities Exchange Act**

378.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

379.    Defendants George Perlegos, Gust Perlegos, Chellam, Hall, Thomas, Fougere and Kim, by virtue of their positions with Atmel and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Atmel within the meaning of §20(a) of the Exchange Act. They had the power and influence and exercised the same to cause Atmel to engage in the illegal conduct and practices complained of herein.

## COUNT IV

**Against Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim for Breach of Fiduciary Duty and/or Aiding and Abetting**

380.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

381.    As alleged in detail herein, Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

382.    As alleged in detail herein, Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

383.    In breach of their fiduciary duties of loyalty and good faith, Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

384.    Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim's foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to and did, unduly benefit defendants Gust Perlegos,

Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann at the expense of the Company.

385.    As a direct and proximate result of the Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim's foregoing breaches of their fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant, the costs associated with the Company's internal investigation, costs and expenses incurred in connection with the Company's restatement of historical financial results, and costs and expenses incurred in connection with the SEC investigation of the Company.

### COUNT V

**Against Defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann for Unjust Enrichment**

386.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

387.    Defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann were unjustly enriched by their receipt and retention of backdated stock option grants and the proceeds they received through exercising backdated stock options, as alleged herein and it would be unconscionable to allow them to retain the benefits thereof.

388.    To remedy defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann's unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized.

## COUNT VI

### Against Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim for Constructive Fraud

389.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

390.    As corporate fiduciaries, Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim owed to Atmel and its shareholders a duty of candor and full accurate disclosure regarding the true state of Atmel's business and assets and their conduct with regard thereto.

391.    As a result of the conduct complained of, Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from Atmel's shareholders despite their duties to, inter alia, disclose the true facts regarding their stewardship of Atmel. Thus they have committed constructive fraud and violated their duty of candor.

392.    By reason of the foregoing, Atmel has been damaged.

## COUNT VII

### Against the Individual Defendants for Corporate Waste

393.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

394.    As a result of the conduct described above, the Individual Defendants will be and have been unjustly enriched at the expense of Atmel, in the form of unjustified salaries, benefits, bonuses, stock option grants, and other emoluments of office.

395.    All the payments and benefits provided to the Individual Defendants were at the expense of Atmel. The Company received no benefit from these payments, and Atmel was damaged by such payments.

396.    Certain defendants sold Atmel stock for a profit during the period of deception, misusing confidential non-public corporate information. These defendants should be required to

disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of Atmel. A constructive trust for the benefit of the Company should be imposed thereon.

## COUNT VIII

**Against Defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann for Breach of Contract**

397.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

398.    As a result of the backdating of options granted to them, defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann have breached their employment agreements with Atmel and violated the Company's shareholder-approved stock option plans, all of which provide that the exercise price of all of the stock options must not be less than the fair market value of the Company's common stock on the date of the grant.

399.    Atmel and its shareholders have been damaged by defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann's breach of contract.

## COUNT IX

**Against Defendants Chellam, Hall, Gust Perlegos, George Perlegos and Thomas for Violation of California Corporation Code §25402**

400.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

401.    At the time that Chellam, Hall, Gust Perlegos, George Perlegos and Thomas sold their Atmel common stock as set forth herein, by reason of their high executive and/or directorial positions with Atmel, Defendants Chellam, Hall, Gust Perlegos, George Perlegos and Thomas had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of Atmel's option backdating, improper accounting, and false financial statements.

402.   At the time of such sales, that information was not generally available to the public or the securities markets.   Had such information been generally available, it would have significantly reduced the market price of Atmel shares at that time.

403.   Defendants Chellam, Hall, Gust Perlegos, George Perlegos and Thomas had actual knowledge of material, adverse non-public information and thus sold their Atmel common stock in California in violation of California Corporations Code §25402.

404.   Pursuant to California Corporations Code §25502.5, Defendants Chellam, Hall, Gust Perlegos, George Perlegos and Thomas are liable to Atmel for damages in an amount up to three times the difference between the price at which Atmel common stock was sold by these defendants and the market value which Atmel common stock would have had at the time of the sale if the information known to these defendants had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim and in favor of the Company for the amount of damages sustained by the Company as a result of their misconduct;

B.   Ordering defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such options that have been exercised, sold, pledged, or otherwise monetized and imposing a constructive trust thereon;

C.   Awarding the Company treble damages as provided by California Corporations Code §25502.5;

D.   Granting appropriate equitable relief to remedy Defendants George Perlegos, Gust Perlegos, Ross, Chellam, Hall, Thomas, Fougere and Kim's breaches of fiduciary duties;

E.   Ordering an accounting of all stock option grants made to defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann, including, but not limited to, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the dates the stock options were exercised, as well as the disposition of any proceeds received by defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann via sale or other exercise of the grants;

F.   Ordering all contracts which provide for stock option grants to defendants Gust Perlegos, Wu, Chellam, Peckham, Colvin, Sisois, Katz, Barton, Turner, Pruniaux and Schumann and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void;

G.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.    Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

DATED: February 20, 2008                SCHIFFRIN BARROWAY
                                        TOPAZ & KESSLER, LLP


                                        _Alan R. Plutzik_, Of Counsel (Bar No. 077785)
                                        Nichole Browning (Bar No. 251937)
                                        2125 Oak Grove Road, Suite 120
                                        Walnut Creek, California 94598
                                        Telephone:  (925) 945-0770
                                        Fax: (925) 945-8792

                                        -and-

                                        Eric L. Zagar (Bar No. 250519)
                                        Tara P. Kao
                                        280 King of Prussia Road
                                        Radnor, PA 19087
                                        Telephone:  610/667-7706
                                        Facsimile:  610/667-7056

                                        _Counsel for Plaintiff_

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    115

## VERIFICATION

I, Patrick McWeeny, hereby verify that I have authorized the filing of the attached

Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to

the best of my knowledge, information and belief.   I declare under penalty of perjury that the

foregoing is true and correct.

DATE: _2/19/08_

PATRICK MCWEENY